(88 South. 240)

No. 24376.

### STATE v. SURRENCY.

(Feb. 28, 1921. Rehearing Denied April 4, 1921.)

*(Syllabus by Editorial Staff.)*

**1. Criminal law ⚖683(3)—Anonymous letters exhibited to defendant held admissible to rebut testimony as to why he disappeared.**

In a prosecution for shooting while lying in wait, where the defendant admitted the shooting but claimed insanity and the unwritten law as a defense and introduced evidence of himself and other witnesses that his sudden disappearance some time before was due to insanity produced by the invasion of his home by prosecuting witness and another, it was permissible for the state to introduce anonymous letters received by the prosecuting witness and which he accused defendant of writing and for which he threatened defendant with prosecution just before his disappearance to rebut defendant's reason for the disappearance, though his authorship of the letters was not shown.

**2. Criminal law ⚖683(3) — Friendly letter written by accused held admissible to rebut his testimony.**

In a prosecution for shooting while lying in wait, where the defendant claimed insanity and testified that prosecuting witness and another had invaded his home and alienated the affections of his wife, it was permissible for the state in rebuttal to offer in evidence a letter admittedly written by defendant some time after his separation from his wife to the man who, with prosecuting witness, was charged with invading defendant's home to show that when the letter was written defendant was on friendly terms with that man.

**3. Criminal law ⚖719(4)—Defendant's admission held to sustain argument based on wife's divorce, although evidence thereof was excluded.**

In a prosecution for shooting with intent to kill, while lying in wait, where the defendant admitted that his wife had procured a divorce in another state, though the state's evidence to that effect was excluded because the record was not properly certified, an argument of the assistant district attorney based on the procuring of such divorce was not subject to the objection that no proof of the divorce had been made.

**4. Criminal law ⚖570(2)—Insanity must appear by preponderance of evidence to justify acquittal.**

In a prosecution where insanity is an issue, the state must make such proof of guilt as would satisfy the jury beyond a reasonable doubt if defendant were admittedly sane and the burden is then on the accused to prove insanity by a preponderance of the evidence, in determining which all of the evidence in the case and the positive legal presumption of sanity must be considered.

**5. Criminal law ⚖782(14)—Instruction on insanity held ambiguous.**

Where the defense was insanity, a charge that if, on the whole testimony, the jury was satisfied the accused was insane when the act was committed, they should acquit, and that it was sufficient if the evidence on that point raises a reasonable doubt to acquit is ambiguous, since it is not clear whether it requires the defendant to prove insanity beyond a reasonable doubt, which imposes too great a burden upon him, or authorizes an acquittal if there is reasonable doubt of his sanity, which is too favorable to defendant, and such ambiguity requires a reversal.

**6. Criminal law ⚖881(2)—Indictment and information ⚖191(4)—Possible verdicts under indictment charging shooting while lying in wait stated.**

In an indictment for shooting while lying in wait with intent to murder, drawn under Rev. St. § 790, as amended by Act No. 24 of 1882, the offense of shooting with a dangerous weapon with intent to murder, defined by section 791 as amended by Act No. 43 of 1890, and of shooting with a dangerous weapon with intent to kill, contrary to Act No. 44 of 1890, are included, but not assaults with intent to murder or kill, defined by section 792 as amended by Act No. 59 of 1896 and Act No. 9 of 1912, and Act 26 of 1892, so that the verdicts which would be responsive are: Guilty as charged, guilty without capital punishment, guilty of shooting with intent to murder, guilty of shooting with intent to kill, and not guilty.

O'Niell, J., dissenting.

Appeal from Sixteenth Judicial District Court, Parish of St. Landry; B. H. Pavy, Judge.

J. M. Surrency was found guilty without capital punishment of shooting another while

defendant was lying in wait, and he appeals. Reversed and remanded.

John W. Lewis, Dudley L. Guilbeau, and Leon S. Haas, all of Opelousas, for appellant.

A. V. Coco, Atty. Gen., R. Lee Garland, Dist. Atty., of Opelousas (T. S. Walmsley, of New Orleans, of counsel), for the State.

DAWKINS, J. Defendant was charged in a bill of indictment as follows:

"That J. M. Surrency at the parish of St. Landry on the 27th day of August, A. D. 1920, feloniously, willfully and of his malice aforethought and whilst lying in wait, shoot one Frank Hadley with a certain dangerous weapon commonly called a shotgun, with intent then and there and in so doing, the said Frank Hadley feloniously, willfully and of his malice aforethought to kill and murder."

He was found guilty without capital punishment, sentenced to life imprisonment, and prosecutes this appeal, relying on six bills of exception to the ruling of the lower court.

### Bill No. 1.

[1] The first bill was reserved to the reading before the jury of a certain anonymous letter which had been received through the mails by the party alleged to have been attacked, and which was as follows:

"Wed. Morning.

"Saw your wife out with your dearest friend Julian just now pard. Why don't you kill both of them?

"Ask him and see what he has to say."

The objection was that the communication had not been proved to be written by accused, was irrelevant, and highly prejudicial before the jury.

The per curiam of the court concedes that the document had not been proven, but states that he permitted it to be read before the jury for the following reasons:

That defendant had taken the stand and admitted the act charged, but in defense thereof, had pleaded:

"(1) Insanity or irresponsibility at the time he shot the prosecuting witness, Hadley.
"(2) The unwritten law."

That in support of the first defense accused had offered evidence to prove that he was a conductor on a railroad from Beaumont, Tex., to Anchorage, and that he had suddenly disappeared while his train awaited his taking out at the former place, and without notice to his employers, all contrary to his constant practice of six years. That his disappearance caused alarm and a search for defendant by the officers of the company, and that the first time they heard from him thereafter he was in Europe; and that this disappearance was so sudden and without cause that it caused the witnesses called to believe he was crazy.

"That in support of the other defense (the unwritten law) defendant testified in his own behalf that the prosecuting witness Hadley, whom he had shot, had invaded his home and caused his wife to desert him, and sue for a divorce, and the custody of his baby boy only six months old. That this so affected him that upon ascertaining that fact he immediately left the country, that he went to Europe, remained there for seven or eight months, traveling all the time in order to try and drive the thought of the invasion of his home by the prosecuting witness, Hadley, out of his mind. That the conduct of the prosecuting witness, Hadley, and one Julian, who were brother conductors of his, towards him, in disgracing his wife and child and causing his wife to desert him, had caused him to temporarily lose his reasoning faculties; had caused him to leave so suddenly. That he had been humiliated by these two brother conductors so often that he feared his life and had left the country so suddenly to avoid them.

"He testified that he returned to this country and found himself in Opelousas without knowing it, that he bought a single-barrel shotgun, lay in wait at the Frisco Depot, and when Hadley appeared on his train going west, he shot him in the back. The defendant's contention being that he was not responsible for this act, that if these brother conductors of his, Hadley and Julian, had invaded his home and disgraced his family, as contended by them, he was excusable.

"In rebuttal of this testimony the state placed

the witness Hadley on the stand, who testified that the day prior to the sudden disappearance of the defendant, he had been told by a brother conductor that the defendant had written the letter attached to bill of exception No. 2, and that this letter was in the caboose in. which the defendant had just returned; that he went to the caboose, he procured this letter, and with the letter attached to this bill he confronted the defendant with and charged him with writing these two letters and exhibited the letters to him and informed him that the night previous his home had been burglarized and several cases of whisky stolen, charging him with this burglary because of the contents of this letter, charged him with writing these letters, and told him that he intended to send him to the penitentiary for ten years for burglarizing his house, and for writing these letters to him.

"The state's contention being that it was this information and charge brought to the attention of the defendant that had caused him to leave the country so suddenly.

"The letters were not offered as having been written by the defendant, but were the letters that the witness Hadley exhibited to the jury and claimed he had charged the defendant with writing when he exhibited them to him in person.

"The state's contention being that it was this information imparted to the defendant that caused him to leave the country, and not the defendant's contention as sent out above."

Since there was no dispute as to the defendant's having committed the act, and the only question was his mental responsibility at the time, we can see no injury that might have resulted from reading this letter to the jury. On the other hand, in view of the proof which accused had tendered in support of the plea of insanity, we think that it was relevant and admissible to show the circumstances under which this document and the one attached to bill No. 2 were received and the accused confronted therewith (even though he denied their authorship) for the purpose of rebutting his own testimony and that of others as to why he left the country. These documents and the accusations made to and against the defendant by the witness Hadley, who had received the one through the mail and found the other in. a caboose

recently occupied by the accused, tended to show that he had disappeared because of the fear of criminal prosecution, rather than for the reasons which he gave.

Hence we find no prejudicial error in the ruling of the court.

### Bill No. 2.

After the defense had closed, the state in rebuttal produced, and had the prosecuting witness Hadley to identify, the following document, as the one which he had found in a caboose recently occupied by accused (he and accused being brother conductors on the same railroad), to wit:

"De Quincy, La., 6—26—19.

"Sheriff Reid, Lake Chas., La.—Dear Sir: I am writing to tell you that there is a family in De Quincy who are and have been selling whisky for sometime, Mr. & Mrs. Hadley. They live down near the Frisco Depot and now have considerable whisky stored in their house. They are going to move to Houston now soon and if you are not able to ketch them selling you will certainly find a lot stored with their household goods when they move. Please keep this information to yourself and I will tell you a lot more when I see you. One Who Knows."

This was the other document referred to in our discussion of bill No. 1, and what we have had to say in passing upon that bill has equal application to the present one.

It was for the jury to decide what weight should be given to all the circumstances surrounding the matter, but we think, as above indicated, that they tended to rebut the defense which the accused had made.

### Bill No. 3.

[2] This bill pertained to the overruling of defendant's objection to the reading before the jury of the following letter, to wit:

"Jesup, Ga., 8—4—19.

"Dear Julian: I am writing you with a view of asking you to get me straight on the G. C. L. and in the beginning will give you a line up of my movements since leaving there. I was worried about my mother who has been sick for a long time (and never will get well for

that matter) and the other female troubles with which I could do nothing with on account of too much family interference and decided that if I would get away from there and go to work some where else she would come to me, but nothing doing. She has declined the call. And of course I realize that I will never be satisfied away from the baby. I realize that I have been hasty in some of my actions for man should not live for himself alone and I have also been selfish to an unwarranted degree. I am satisfied that if I could swap jobs with Hadley or get or take some other job away from De Quincy it would only be a question of time before she would see her mistake and we would get along all right. I am going to ask you to see the management about this for me and do what you can to get things straightened out for life is bad enough at best without starting thro it with your children in a foreign land. You can take it from me an estrangement is hell, and this has certainly made a good dog out of me. If the woman will not leave her family for me I can't help it, but I feel that I should take care of her and the baby whether she does or not. And furthermore, I would want to be near them if either should have any misfortune. Now Julian, we are all human and do and act foolish at times in spite of our better intentions. How truly it has been said, 'Man's inhumanity to man makes countless thousands mourn.' Now Julian I want you to be my friend and help me in this matter and I feel sure that it will only be a question of time before the woman will see her mistake and be reconciled to the fact that too much family interference will not do. This estrangement will certainly put the fear of God in a persons heart and the Bible has truly said that that is the beginning of wisdom. Now Julian I want you to be broad in this and help me and probably I will be in a position to do as much or more for you some day. We are all alive but cannot tell what may befall us before we are buried. Even as you have your family now I hope to have and enjoy mine some day. Life is hell to a person situated as myself and I realize that a billion dollars would not satisfy near so much. Please consider what I ask of you and if you can see yourself justified please do as I ask you and please consider this on the square and do not show any one this letter unless it be your wife. All I want to do in this life is that which is right from now on and I am asking your assistance that I may rectify the mistake I have made to my ex-wife and baby. Please let me hear from you at your earliest convenience.

"Fraternally yours,        J. M. Surrency."

We are informed by the judge's per curiam that accused admitted writing the letter, and that it was admitted in evidence in rebuttal for the reasons given in the court's ruling on bills Nos. 1 and 2, and for the further reason that accused had testified in his own defense that Conductor Julian had also invaded his home and disgraced his family; the court being of the view that it tended to show a friendly relation between the parties, instead of the hostile one which accused swore to.

We find no error.

### Bill No. 4.

[3] Bill No. 4 was reserved to the following language used in argument by the assistant district attorney, to wit:

"This defendant's plea of the unwritten law or his pretension of having shot Hadley for this cause is all rot. Why, gentlemen of the jury, Surrency's wife obtained a divorce against him in the courts at Houston, Tex., and this don't look very much like he had any cause to complain."

It appears that the court had ruled that the written evidence to show that the divorce had been granted in the Texas court was not admissible for the reason that it was not properly certified, but the judge informs us that while on the stand in his own behalf defendant admitted that his wife had obtained a judgment of divorce and custody of his child in the courts of Houston, Texas.

Since the objection was based upon the contention that no proof of the divorce in the Texas court had been made, in view of the court's statement of the facts to the contrary, we sustain the ruling on this bill.

### Bill No. 5.

The trial court charged the jury, with reference to the issue of insanity, as follows:

"The proof of insanity must satisfy you that the accused was not of sane mind at the time of the act charged. You should consider all the testimony before you whether produced by

the accused or the state, and give due weight to the presumption of sanity.

"If on the whole testimony, and giving to the presumption. of sanity its full operation, you are satisfied the accused was insane when the act was committed, you should acquit. It is sufficient if the evidence on this point raises a reasonable doubt to acquit."

And as to which the exception says:

"To which charge counsel for defendant excepted on the ground that the same was not in accordance with the issues presented to the jury; because the same did not clearly indicate or present to the jury the question of responsibility or irresponsibility vel non; because the same was contradictory and confusing when taken in connection with other portions of his honor's charge and was calculated to mislead and misdirect the jury in its deliberations and findings in the premises."

[4] The questions of the sufficiency of the evidence and burden of proof on the issue of insanity have given the courts of England and of this country no little difficulty. The early doctrine of the English courts was that insanity was a special defense which the accused should sustain by proof precluding a reasonable doubt as to his insanity. (The authorities on that score being reviewed by us both in the majority and concurring opinions in State v. Scott, 49 La. Ann. 253 and 259, 21 South. 271, 36 L. R. A. 721, and in the case of State v. Lyons, 113 La. 959, 37 South. 890, we see no occasion to again do so here.) The same view was announced in the early decisions of a few of the courts of this country. However, the modern rule is that while there is a legal presumption of sanity in all cases, the defense, where insanity is relied upon as excusing from responsibility for the commission of an act which otherwise would be criminal, needs only to support the plea by a perponderance of proof of such insanity. See authorities cited in State v. Scott and State v. Lyons, supra; also, Wharton's Criminal Law, vol. 1, pp. 108, 109, et seq.; Wharton's Criminal Ev. (10th Ed.) vol. 1, pp. 686, 689. Other courts have gone so far as to hold that the prosecution must prove the accused's sanity beyond a reasonable doubt. Wharton's Crim. E. vol. 1, p. 687 et seq.; and authorities in footnote.

In their brief, counsel for defendant quote at length from page 995 of 113 La., from page 903 of 37 South., of the opinion in the Lyons Case, and the part quoted would appear to have us say that, once a beginning of proof of insanity is made by the defense, no matter how weak and unconvincing, it is sufficient to overcome the presumption of sanity, and to cast the burden upon the state of proving sanity beyond a reasonable doubt just as the issue of innocence or guilt. However, while the manner in which the subject-matter of the quotation is used, standing alone, might be susceptible of that construction; yet the very next sentence, following the part which was quoted, shows clearly that we did not approve that view, for we say:

"For the reasons which have been given, we are unable to concur in such a conclusion, and therefore, affirm the ruling of the court a qua, and the jurisprudence of this court, upon which it is predicated."

The charge assailed in that case was that in order to shield himself from responsibility, where insanity was pleaded as a defense to an otherwise criminal act, the defendant had to establish that plea "by a preponderance of the whole evidence in the case." Of course, the part of the charge just quoted was not altogether accurate, because the accused does not necessarily introduce the "whole" evidence on the case; and what was meant was, only, that the insanity should appear by a preponderance of all the evidence.

[5] The language of the charge in the present case is so worded that we cannot determine whether the court intended to say that, if the proof introduced by the defendant to show insanity created a reasonable doubt

as to his sanity (which is the same thing as saying that he should prove insanity beyond a reasonable doubt), the jury should acquit; or whether he meant to say that, unless the state proved sanity beyond a reasonable doubt, there should be an acquittal. We quote that part of the charge again:

"If on the whole testimony, and giving to the presumption of sanity its full operation, you are satisfied the accused was insane when the act was committed, you should acquit. It is sufficient if the evidence on this point raises a reasonable doubt to acquit."

If the first construction just stated was intended, the same was in conflict with State v. Scott, supra, in which we reversed the conviction because the court had charged that the accused had to prove insanity beyond a reasonable doubt. If the latter interpretation is adopted, it was most favorable to the accused, but still not the law as announced by the jurisprudence of this court.

When insanity is an issue, the state and the accused are placed in the following relative positions:

The state must make such proof of guilt as would satisfy the jury beyond a reasonable doubt, as in the case of an admittedly sane individual. When this is done, then the accused assumes the burden of proving insanity by a preponderance of the evidence. In deciding the case, there stands on the side of the state the proof of guilt plus the positive legal presumption of sanity, which presumption, if the case is otherwise made out beyond a reasonable doubt, is sufficient to convict. On the side of the defense stands the negative of that presumption (of sanity) which he must combat and overcome by proof sufficient to establish a preponderance of evidence in favor of insanity. And against such evidence on the part of accused is also to be weighed any positive proof which the state may offer, in addition to the legal presumption, to establish sanity. If, on the whole, considering all of the evidence as

to his mental condition, there is a preponderance of proof in favor of insanity of a character to render the defendant irresponsible, then the accused should be acquitted; if not and the proof otherwise convinces the jury of his guilt beyond a reasonable doubt, he should be convicted.

In view of the uncertainty of the charge, we are of the opinion that the jury were not given the benefit of the law on the subject of insanity, and for that reason the verdict and sentence must be set aside.

### Bill No. 6.

[6] In view of our conclusion on bill No. 5, it would not be necessary to pass upon bill No. 6, but for the fact that the court below will be called upon again to charge the jury with respect to the matters raised therein.

This exception was as to the verdicts which might be rendered. The court instructed the jury that there were five verdicts which would be responsive to the charge, to wit: (1) Guilty as charged; (2) guilty without capital punishment; (3) guilty of shooting with a dangerous weapon with intent to murder; (4) guilty of shooting with a dangerous weapon without intent to kill; and (5) not guilty. Whereas, the defense contends that there were only three verdicts which would have been responsive, viz.: (1) Guilty as charged; (2) guilty without capital punishment; and (3) not guilty. And in support of that contention, they say:

"We must assimilate the charge in this case to one of murder, for the punishment is the same in both cases. We must also assimilate the present indictment to an indictment for murder, and in these circumstances, and under the plain rule of legal interpretation, we inevitably conclude that the verdicts of 'guilty of shooting with a dangerous weapon with intent to murder,' and 'guilty of shooting with a dangerous weapon with intent to kill,' would be wholly and utterly irresponsive."

The law under which the accused was charged is section 790 of the Revised Statutes as amended by Act No. 24 of 1882, and is as follows:

"If any person lying in wait, or in the perpetration or attempt to perpetrate any arson, rape, burglary or robbery, shall shoot, stab, cut, strike or thrust any person with a dangerous weapon, with the intent to commit the crime of murder, he shall, on conviction thereof be punished with death."

According to this statute, a person would be guilty of a capital offense where he shot, stabbed, cut, struck, or thrust another, with intent to commit murder, in any one of several circumstances, to wit: While lying in wait, while in the perpetration or attempt to perpetrate arson, while perpetrating or attempting to perpetrate rape, while perpetrating or attempting to perpetrate burglary, or while perpetrating or attempting to perpetrate robbery. However, in the present case, we are concerned only with the crime of shooting with a dangerous weapon, charged in the bill as having been committed, while lying in wait.

Section 791, R. S. as amended by Act No. 43 of 1890, provides:

"Whoever shall shoot, stab, cut, strike or thrust any person with a dangerous weapon, with intent to commit murder, under any other circumstances than those mentioned in the preceding section, shall, on conviction, suffer imprisonment at hard labor or otherwise, for not less than one, nor more than twenty-one years."

And section 792, as amended by Acts Nos. 59 of 1896 and 9 of 1912, denounces the crime of assaulting by willfully shooting at with intent to commit murder, etc., and on conviction provides imprisonment with or without hard labor for not more than 20 years.

And Act No. 26 of 1892 provides that whoever shall lie in wait armed with a dangerous weapon, with intent to commit murder, etc., shall suffer imprisonment at hard labor for not less than one nor more than ten years.

Act No. 44 of 1890 provides that whoever shall shoot, stab, cut, strike, or thrust any person with a dangerous weapon, with intent to kill, shall suffer imprisonment with or without hard labor for not more than three years.

However, the crime denounced in section 792 is that of assault, which may be committed under any one of the circumstances therein mentioned; while the offense in the Act No. 26 of 1892 is the lying in wait.

So that we must look to sections 790, 791, and Act No. 44 of 1890, all of which denounce the offense of shooting with a dangerous weapon, for the verdicts which may be rendered. The first inquiry therefore is: What is the genus of the offense? The answer is, shooting with a dangerous weapon, and the doing of that act under the different circumstances described in the sections 790, 791, and Act No. 44 of 1890, constitute the species. Shooting with a dangerous weapon while lying in wait, with intent to commit murder, is one species, punishable under section 790; shooting with a dangerous weapon, with intent to commit murder, under any other circumstance than while lying in wait, is another, punishable under section 791; and, since the intent to commit murder necessarily includes the intent to kill, a conviction may be returned under the act of 1890, if the circumstances do not show an intent to murder but to kill. See State v. Matthews, 111 La. 962, 36 South. 48; Marr's Crim. Juris. p. 112, § 62.

Therefore, the verdicts which would be responsive under the charge in this case are: (1) Guilty as charged; (2) guilty without capital punishment; (3) guilty of shooting with intent to murder; (4) guilty of shooting with intent to kill; and (5) not guilty.

For the reasons assigned, the verdict and sentence appealed from are set aside, and this case is hereby remanded, to be proceed-

ed with according to law and the views herein expressed.

O'NIELL, J., dissents.