FOURNET, Chief Justice.
The defendant, Louis Chinn, having been convicted on an indictment charging him with the murder of Dominick Boeta and sentenced to death in the electric chair, prosecutes this appeal, relying for the reversal thereof on a number of errors alleged to have been committed during the trial, ten of which have been perfected in bills of exceptions. In order that these various bills may be properly understood, we deem it necessary to go in some detail into the facts of the case as disclosed by the record before us.
It appears that the accused, who is an average uneducated Negro of 25 or 26, had been, for many years, doing odd jobs around a combination ice house, fruit exchange, , and produce loading platform ■ in Baton Rouge, including part time work as a help- . er on the truck Dominick Boeta operated in peddling fruit and vegetables through Baton Rouge and on plantations across the river from that city. On the morning of Friday, April 30, 1954, he had been working around the exchange for several hours when Boeta, going there for. supplies, asked. Chinn to accompany him on his rounds, which Chinn did, driving the truck part of the time and assisting in peddling.
*991 The trip through the south part of Baton Rouge proved to be unprofitable and Boeta returned to the exchange to obtain garbage and proceeded across the river to feed hogs he kept there, stopping along the way to peddle. After making the rounds through the Negro quarters of Catherine, Allendale, and Smithfield plantations, he arrived at the place where the hogs were kept around 7:00 p. m. On leaving he noticed the tail light was out and, at his instruction, this was fixed by Chinn. However, the truck seemed to be giving other trouble and a stop was made at a service station around 8:30 p. m., where work was done that later proved to be inadequate. Returning through Westover plantation, and when a point near Mullato Bend along the river road had been reached around 11:00 p. m., all of the truck lights went out and Boeta got out of the truck to investigate. While standing at the back of the truck Chinn hit him in the head with an iron hammer used in opening crates, and he fell to the ground. While lying there, Chinn hit him several additional times, and, as he continued to groan and move about, twisted his (Chinn’s) belt around Boeta’s neck. He then put Boeta in the truck and drove with him back through Allendale. He threw the hammer away in a cane field enroute, some seven miles away from the place where he hit Boeta, and finally left the body, still breathing, in the weeds by the side of the road at the foot of the levee near the bridge. He removed from Boeta’s pocket some $10 in paper money, and from a purse attached to a money belt around his waist approximately three dollars in change. Driving across the bridge on the return to Baton Rouge, he threw the purse (in which was contained papers belonging to Boeta) into the river. He abandoned the truck near the ship docks in Baton Rouge, threw the keys away to prevent pursuit, walked to the bus station, and caught a bus for New Orleans around 1:00 in the morning. He was picked up in New Orleans around 7:00 a. m., Sunday, May 2, 1954, in front of the home of a man who employed him occasionally and who had been alerted by Baton Rouge police (who had discovered the abandoned, blood-soaked truck, and had no way of knowing the crime had been committed in West Baton Rouge Parish) to be on the lookout for him.
After his arrest Chinn was taken to the homicide office of the New Orleans Police-Department and there made a written confession [1] in the presence of two New Orleans officers and three from Baton Rouge, who had come down to pick him up. Learning from the confession where Boeta’s body had been left, the officials of West Baton *993 Rouge Parish were contacted and the officers from Baton Rouge turned Chinn over to officials from that parish at Gonzales. These officers returned Chinn to Baton Rouge via Donaldsonville for his protection.
Later that day, in the Baton Rouge jail, Chinn again confessed to the crime, the confession being preserved on tape recording.[2] Two days later, on May 4, while being questioned by the district attorney and sheriff of West Baton Rouge Parish, as well as other officials, Chinn requested that he be left alone with two of these officials and to them admitted he had not told the whole truth at the time of his two previous confessions since the beating of Boeta had occurred on Westover plantation, not Allendale, and he had used as the weapon an iron crate hammer, not a piece of iron pipe used as a car jack handle, as he had first said. When the hammer could not be found at the point indicated by Chinn, he was again questioned the following morning, and gave more explicit instructions that led to its discovery. Chinn then sent for the district attorney of West Baton Rouge Parish and, at the request of Chinn, a third and more complete confession was tape-recorded May 7, 1954.[3]
The accused was charged by indictment with the murder of Boeta and arraigned September 14, 1954. On that same day counsel appointed by the court to represent him entered a plea of “not guilty” in his behalf. On the next day, stating they had reasonable grounds to believe the accused “is insane or mentally defective to the extent that he is unable to understand the proceedings against him or to assist in his defense,” requested a hearing to determine the defendant’s mental condition, and that the court, after such hearing, appoint “qualified experts to examine the defendant, and inquire into his present mental condition and report their findings” to the court. In accordance with this request, which was granted, counsel were permitted to file a written plea of “present insanity,” and after the preliminary hearing, the court, by order of September 17, 1954, appointed a lunacy commission composed of Dr. E. M. Robards, superintendent of the East Louisiana State Hospital for the mentally ill; Dr. L. F. Magruder, a well-known psychiatrist of Baton Rouge; and Dr. Paul B. Landry, Sr., coroner of West Baton Rouge Parish, to examine the “present mental condition and sanity of the accused.” And although this commission returned to the court a unanimous opinion to the effect that Chinn’s mentality was of such a low grade it interfered “with his *995 ability to choose between right and wrong, and as such should be considered legally insane,” the court, after a full hearing on October 21, 1954, during which all three experts, lay witnesses, and the accused were examined, denied the plea of present insanity and ordered the defendant to stand trial. (Emphasis supplied.)
This ruling forms the basis for the first bill reserved, and, because of its importance, and particularly in view of the report of the commission, we have given it most careful consideration, reviewing and analyzing all of the testimony at the hearing, as well as the 24-page written opinion of the trial judge in which he painstakingly, fairly, and patiently gives us his appreciation of the evidence on the plea and the controlling law.
At the hearing Dr. ’Robard confirmed the unanimous finding of the lunacy commission appointed by the court that the accused was not suffering from any psychosis, i. e., mental disease or serious mental derangement. However, based on tests made by other psychologists at the state hospital, he classified the accused as possessed of a mentality between an imbecile and a moron. This classification results solely from the fact that Chinn had a low intelligence quotient of between 50 and 60, it being the doctor’s conclusion that although he knew the difference between right and wrong, he could not, because of this low i. q., choose between the two. The substance of his testimony was summarized by state counsel in the following question: “ * *' * your testimony simply boils down to the fact this man has a low grade mentality. This man you say knows the difference betweeñ right and wrong, but in your opinion cannot choose between the two. Furthermore, you stated * * * this man knew what happened that night in question, and you feel he could tell his counsel about it, and you feel he knew this was a murder charge against him. * * * Despite all that, you say you think this man is legally insane and he should be committed. That is what you said?” To this Dr. Robard replied: “That is what I said.” It is obvious, therefore, that according to this expert the accused knew what had taken place, knew he was charged with murder, could understand the nature of the proceedings against him, and could assist counsel within the limits of his intelligence in the preparation of his defense.
' Dr. Magruder, a physician specializing in psychiatry in Baton Rouge, placed Chinn in a borderline group between an imbecile and a low grade moron, having the mentality of a child between 8 and 9. In essence he agreed with the conclusion reached by Dr. Robard, that is, that Chinn understood the' nature of the proceedings and could cooperate with counsel in the preparation of his defense within the limits of his intelligence.
The - third member of the commission, who had" been coroner of West Baton Rouge Parish for some 25 years, stated he *997 found the accused to be an average “darky with no education.” He said he signed the report in deference to the recommendations of the other two members, who were considered experts in psychiatry while his experience had been practical only, but had, at the time, disagreed with their conclusion the accused, knowing the difference between right and wrong, could not choose between the two. It was Dr. Landry’s opinion that it was difficult to tell whether Chinn could not choose between the two. because of a low mentality, or merely because he did not want to. He stated it was practically impossible to determine in such a case whether the subject was telling the truth or faking. In this respect he is corroborated by the other two experts. Dr. Magruder stated unequivocally he was unable to say whether Chinn was faking.
From the foregoing it is clear that the accused was not suffering from any psychosis or other mental deterioration or disease, and that the conclusion of the experts was based solely upon his low intelligence quotient, although they were unanimous in their conclusion it was almost impossible to determine whether he did in fact possess such a low mentality or was faking.
We are mindful of the fact that it is possible for a person to have such a feeble mentality as to be unable to distinguish between right and wrong, to understand the proceedings against him, or to assist in his defense. However, according to the universally accepted jurisprudence, mere weakness of mentality or sub-normal, intelligence does not, of itself, constitute legal insanity. State v. Brodes, 160 La. 340, 107 So. 131; State v. Tapie, 173 La. 780, 138 So. 665; Commonwealth v. Stewart, 255 Mass. 9, 151 N.E. 74, 44 A.L.R. 584; 14 R.C.L. 603; 22 C.J.S., Criminal Law, § 58, p. 121. The test for determining the present insanity of an accused, as set out in these authorities, is codified and set out precisely in our Revised Statutes thuslyr “If * * * the court has reasonable ground to believe that the defendant * *■ is insane or mentally defective to the extent that the defendant is unable to understand the proceedings against him or to assist in his defense, the court shall immediately fix a time for a hearing to determine the defendant’s mental condition. The court may appoint two disinterested physicians to examine the defendant with regard to his present mental condition and to testify at the hearing. Other evidence regarding the defendant’s mental condition may be introduced at the hearing by either party. If the court, after the hearing, decides that the defendant is able to understand the proceedings and to assist in his defense, it shall proceed with the trial.” LSA-R.S. 15:267. See, State v. Estes, 212 La. 694, 33 So.2d 199; State v. Layton, 217 La. 57, 46 So.2d 37; State v. Swails, 223 La. 751, 66 So.2d 796; and State v. Riviere, 225 La. 114, 72 So.2d 316, 317. (Emphasis has. been added.)
*999 We think the following observation in the very recent decision of this court in the Riviere case is most appropriate here: “The law presumes that every man is sane. State v. Seminary, 165 La. 67, 115 So. 370, State v. Toon, 172 La. 631, 135 So. 7. And to warrant the sustaining of a plea of present insanity, thereby preventing trial of a criminal action, it must appear by a preponderance of evidence that the accused is so mentally deficient that he lacks capacity to understand the nature and object of the proceedings against him and to assist in the conducting of his defense in a rational manner.”
We are impressed that the confessions and testimony of the accused disclose, to say the least, an average intelligence of people of this class. He was able to remember and to relate in detail, with particularity and accuracy, everything that transpired from the time he went with Boeta around 10:00 a. m. Friday morning, April 30, 1954, up to and including his arrest around 7:00 a. m. Sunday morning, May 2, even detailing the names of the streets traveled and the right and left turns made, the names of the plantations visited and the routes taken off the main roads, as well as the details of the crime itself. It is interesting to note that when arrested in New Orleans he denied any knowledge of the crime, and even claimed it had been committed by another Negro, known to him. It was not until he was confronted with the fact the officers knew and could show he had been with Boeta all during the day, that Boeta had disappeared and his blood soaked truck found in Baton Rouge, that he told the truth, his motive then being the thought that if Boeta was still alive he could be given medical assistance. He knew Boeta had been alive and breathing when left by the road side, and he felt that by telling where his body could be found and he might be saved, this would also “help me out.”
In addition to prompt and responsive answers, and a straight-forward, rational, and logical sequence of narrative, the accused gave as the motive for his act the fact that he needed money for his wife, who' had threatened to have him put in jail for nonsupport. The fact that he knew he had done wrong and realized the enormity of his offense was made very obvious to us as we listened to the confessions that were tape-recorded, for he broke down completely and sobbed in a voice filled with emotion when he reached the point in the story where he told of how he hit and choked the victim, acknowledging Boeta had been most kind to him during the several years he had worked for him intermittently.
Furthermore, when placed on the witness stand in an effort to show he told the district attorney during the Baton Rouge confessions he had been struck at the time of his arrest, his comment when it was intimated by questions put to him that the tape recording did not reflect this speaks eloquently of his knowledge of the proceedings and his ability to assist counsel in his *1001 defense, for he said, “Some of it could have been cut off and some not. They take what they want to hear, and some of it they don’t take,”
In addition to the testimony of these experts and the confessions as well as testimony of the accused, the state introduced a number of lay witnesses who had known the accused for some time (years in many instances) and had had ample opportunity to observe him, including those in charge of him during his incarceration in the Baton Rouge jail. All testified they observed nothing abnormal or in any way different about him and felt he was presently sane. The trial judge who examined and observed him was of the same opinion.
From our appreciation of the entire record we have no hesitancy in concluding the accused was able to understand the proceedings against him and to properly assist counsel in his defense and that the trial judge correctly ordered him to stand trial.
Following the dismissal of the plea of present insanity, the accused was re-arraigned and pleaded insanity [4] and the court entered a plea of “not guilty” in his behalf when counsel refused to so plead. When the court refused to permit him to have a trial on the plea of insanity independently of the plea of not guilty, he reserved the second bill, it being counsels’ contention that he was entitled to go to trial on this plea alone inasmuch as one of the four pleas that may be made to an indictment is “insanity,” under LSA-R.S. 15 :261.
There is no merit to this bill. In deciding this identical contention adversely to argument of counsel in State v. Dowdy, 217 La. 773, 47 So.2d 496, 502, we commented: “The ruling of the trial judge was entirely proper for a plea of insanity at the time of the commission of the crime involves a fact affecting the guilt or the innocence of the accused and necessarily it must be tried on the merits and submitted to the jury the same as all other facts presented during the trial of the case. See State v. Eisenhardt, 185 La. 308, 345, 349, 169 So. 417; State v. Sample, 203 La. 841, 845, 14 So.2d 678.”
The next two bills were reserved in connection with the admission of the three confessions — Bill of Exceptions No. 3 when the New Orleans confession of May 2 was admitted and the other when the two tape-recorded confessions made in Baton Rouge on May 2 and 7 were admitted. They were discussed together by defense counsel, and will be so considered by us.
In disposing of the third bill, the trial judge, and we think properly so-, concluded “the evidence shows that no force or violence was used on the accused and that the accused was not threatened nor made any promises whatsoever to induce him to con *1003 fess.” He states that although the accused himself testified that upon the occasion of his arrest “Patrolman Delpuget struck him once in the stomach, which was denied not only by Patrolman Delpuget but by the officers present,” when called to the stand the accused “admitted that from the time he arrived at the Criminal Court Building until the time of his confession no force or threats were used on him. All of the officers present at the time of the making of this confession testified that the statement made by the accused was free and voluntary.”
Counsel, in reliance upon our holding in State v. Ploneycutt, 216 La. 610, 44 So.2d 313, claims that inasmuch as the state failed to produce and call to the stand certain persons[5] who happened to be at or near the scene of the arrest, either in laying the foundation for the admission of the confession or in rebuttal after accused testified he had been mistreated at that time, it had not carried the burden of proving the confession was free and voluntary. In other words, counsel argue that for the state to prove a confession is free and voluntary, it must produce all persons that may have been present on any occasion the accused happens to testify he was mistreated.
A perusal of the Honeycutt case shows it is not authority for that proposition. Although .the state there, in laying the foundation for the introduction of the confession, placed on the stand all those present when it was written around 7:00 a. m., one of whom stated the accused was not mistreated the previous night after arrested, and taken to headquarters, it failed to' recall a single one of these officers to either corroborate the statement of the officer who testified the. accused had not been mistreated the previ- • ous night, or to rebut the testimony of the accused that his real confession was made that night after he had been subject to severe physical violence and only reduced to writing the following morning. In. the instant case witnesses were called in rebuttal. Furthermore, the accused did not claim he confessed when arrested (at which time he was allegedly mistreated), as in the Honeycutt case. On the contrary, he vehemently denied any knowledge of the disappearance of Boeta, asserting he had been alive when he left him. It was only after he was taken to headquarters and questioned in an effort to' ascertain where Boeta might be so that medical assistance could be administered if needed, and after confronted with the array of evidence gathered by the Baton Rouge officers showing that he *1005 and he alone had been with Boeta all during Friday and into that night, that he broke down and sobbed his story, stating he knew Boeta was still breathing when he was left by the road- side, and he felt if Boeta could be found and was still alive and could be helped, it-might help him (Chinn).
For us to hold as contended by counsel for the defendant, all one charged with crime would have to do to prevent the introduction of a confession, no matter how freely and voluntarily given, would be to-make some showing there had been other persons'present' on the occasion of a purported mistreatment, whether such persons were known to the state or not.
Counsels’ argument in support of the contention that the tape-recorded confessions of May 2 and 7 should not have been admitted is three-fold: (1) That inducements and promises were used: and that (2) pressure, and (3) coercion were exerted.
There is not a scintilla of evidence to support these contentions. We are in complete agreement with the trial judge who, in court, stated he was convinced the recordings show the full, true, and exact replica of the statements as given in Baton Rouge and that “at the time * * * the accused was free of any constraint, threats, intimidations or promises of any kind whatsoever.”
During the course of the trial, while the state was presenting evidence in the form of a cap allegedly worn by Boeta at the time of the crime, there was an outcry by his widowi The jury was immediately retired, Mrs. Boeta removed from the courtroom, and the jury, upon recall, instructed to disregard this emotional demonstration and to rely solely upon the facts developed during the trial and the law given in the official charge in determining the guilt or innocence of the accused. The judge’s refusal to grant counsels’ motion for a mistrial, based on this outburst, forms the basis of the fifth bill, it being their contention this outcry, as well as Mrs. Boeta’s continued presence in the building, although outside the courtroom, had the effect of swaying and prejudicing the jurors in derogation of defendant’s right to a fair and impartial trial.
This exact contention has been decided adversely in a number of cases and is, therefore, untenable, particularly in view of the judge’s prompt action in retiring the jury with instructions to disregard the incident. See, State v. Renard, 50 La.Ann. 662, 23 So. 894; State v. Spillers, 105 La. 163, 29 So. 480; State v. Wimby, 119 La. 139, 43 So. 984, 12 L.R.A.,N.S., 98; and State v. Williamson, 145 La. 9, 81 So. 737.
The next three bills are interrelated and will be discussed together. Counsel reserved Bill of Exceptions No. 6 when the court allegedly failed to comply with its mandatory duty to examine, during the trial, the experts, appointed under the order *1007 of September 17, 1954, and, instead, "ordered” counsel to examine them. Bill No. 7 was reserved when the trial judge allowed Dr. Landry, over defendant’s objection, to testify contrary to the finding of the lunacy commission report of 'October 16, 1954, to which he had originally subscribed, and to explain his reason for signing it. The eighth bill was reserved when the judge refused to grant a continuance, based on the ground accused was surprised by such testimony.
While under the express provisions of LSA-R.S. 15:268, the court “Whenever * * * the existence of insanity or mental defect on the part of the defendant at the time of the alleged commission of the offense charged becomes an issue in the cause * * * may appoint one or more disinterested physicians * * * to examine the defendant”, and after such appointment is made “The physicians appointed by the court shall be summoned to testify at the trial and shall be examined by the court and may be examined by counsel for the state and the defendant”, when insanity was made a defense in this case, the court was never requested to, nor did it in fact, in the exercise of the discretion vested in it by this section, appoint any physicians to examine defendant to determine “the existence of insanity or mental defect * * * at the time of the alleged commission of the offense." Consequently, the provisions of LSA-R.S. 15:268, making it the mandatory duty of the judge to examine such experts, once appointed, has no application here.[6] The commission appointed by the judge on September 17, 1954, was for the sole and specific purpose of examining and reporting “on his present mental condition and sanity” to determine whether, as contended by counsel, he was not “of sound mind and tinderstanding at the present time." (Emphasis supplied.)
Counsels’ argument that they did not need the testimony of these experts since the report of the commission was admissible and prima facie correct, and that the judge erred in “ordering” them to call and examine these experts, is untenable. In the first place, the judge did not compel counsel to call and examine these experts. Instead he ordered counsel, who had had the experts subpoenaed, to examine them but only to the extent that counsel deemed it “advisable and necessary to protect the interests of the accused.” In the next place, counsel err in contending the report was prima facie evidence of the insanity of the accused at the time of the commission of the offense. As heretofore pointed out, these experts only inquired into and reported on the present insanity of the accused, an aspect of the case that was not before the jury since it could only be deter *1009 mined by the trial judge. Finally, counsel overlook the fact that having urged insanity at the time of the commission of the offense as a defense, they must bear the burden of establishing this fact by a preponderance of the evidence for the benefit of the jury inasmuch as the law presumes that a person is sane. State v. Scott, 49 La.Ann. 253, 21 So.2d 271, 36 L.R.A. 721; State v. Surrency, 148 La. 983, 88 So. 240; State v. Seminary, 165 La. 67, 115 So. 370; State v. Toon, 172 La. 631, 135 So. 7; and State v. Patterson, 176 La. 440, 146 So. 17.
In his per curiams to these bills the judge correctly states that once Dr. Landry was called as a witness on behalf of the accused, he had a right to explain his action in signing the lunacy commission report, and that his credibility and the weight to be given this testimony was a matter for the determination of the jury, as all other facts. He points out, additionally, that inasmuch as this testimony was substantially in accordance with the same doctor’s testimony at the time of the hearing before him to determine the present insanity of the accused, counsel could not have been taken by surprise and were not, therefore, entitled to a continuance. Clearly, therefore, there is no merit to any of these three bills.
Bill of Exceptions No. 9, reserved to the action of the trial judge in permitting lay witnesses to testify on the issue of the sanity of the accused at the time of the commission of the offense, is without merit also. As pointed out in our recent decision in State v. Swails, 226 La. 441, 76 So.2d 523, 528, “It is well settled in this State, and by the overwhelming jurisprudence of this country, that a non-expert witness, basing his testimony on facts and circumstances known to him, may be permitted to give opinion testimony touching upon the sanity or insanity of a person whose mental condition is at issue, provided the witnesses be shown to have had ample opportunity to observe the speech, manner, habits and conduct of such person.” See, also, the authorities therein cited. The trial judge points out that the proper foundation was laid in the instance of all of the lay witnesses called to the stand to testify, and the note of evidence attached to this bill amply sustains this conclusion.
The final bill was reserved when motion for a new trial, based on the errors just disposed of, was denied, and, therefore, presents nothing for our review.
For the reasons assigned, the conviction and sentence are affirmed.

. Present at the time were Desk Sgt. James'Ernest LaVergne (who typed the confession as it was made) and homicide officer John Delpuget (who made the arrest), members of the New Orleans police force; Lt. H. G. Leach and deputies Earl L. Guss and Tom W. Henderson from the office of the Sheriff of East Baton Rouge Parish.

. Present at the time was the district attorney of West Baton Rouge Parish, Ms secretary, the sheriff and a deputy from that parish, and the operator of the recording machine, who was a deputy sheriff of East Baton Rouge parish.

. Present at tMs time were the district attorney of West Baton Rouge Parish and his secretary, a deputy sheriff of that parish, a lieutenant of the East Baton Rouge Parish sheriff’s office, and the same deputy who had previously done the recording.

. Counsel had some time previously, and with court permission, withdrawn the original plea of “not guilty” in lieu of a motion for a bill of particulars.

. It appears tliat during the examination of the several witnesses present when the accused confessed in New Orleans police headquarters it developed that in addition to some unknown bystanders, a police officer by the name of Stevens was present when he was arrested, that some time thereafter a patrol car manned by officers Stentz and Michel was called to take him to jail, and, further, that at some point during the incident — just when is not clear — accused’s employer emerged from the house.

. State v. Sauls, 226 La. 694, 77 So.2d 8, has no application inasmuch as experts were there appointed to determine the sanity of the accused at the time of the commission of the offense.