175 So.2d 293

**STATE of Louisiana**

**v.**

**Arlen WHISENANT.**

**No. 47569.**

May 3, 1965.

Rehearing Denied June 7, 1965.

R. Hunter Pierson, Alexandria, James Farrier, New Orleans, for defendant-appellant.

Jack P. F. Gremillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., F. Jean Pharis, Dist. Atty., Jules L. Davidson, Jr., Asst. Dist. Atty., for appellee.

HAMITER, Justice.

The defendant, Arlen Whisenant, was charged in a bill of information with armed robbery, it being alleged therein that the crime was committed on or about May 9, 1963.

Before any formal proceedings on the information were conducted Mr. Hunter Pierson, a member of the Rapides Parish Bar, was assigned by the court to represent the defendant. In passing, we take the liberty of observing that he has ably performed his assignment.

On May 17, 1963 the defense moved for and obtained the appointment of a sanity commission which, on May 31, 1963, investigated into defendant's "present" mental condition and also that at the time of the commission of the offense.

Subsequently, the commission filed its report, it being to the effect that the defendant was presently insane and was insane at the time of the occurrence of the crime. Whereupon, he was adjudged presently insane and committed to the East Louisiana State Hospital at Jackson.

Thereafter, in October, 1963, following a report from the doctors at such hospital that defendant was then sane, a second hearing was held relative to his present sanity. As a result thereof he was adjudged presently sane and remanded for trial.

Upon arraignment, the defendant pleaded not guilty by reason of insanity.

Later, he was tried by a jury of twelve, found guilty as charged, and, after the overruling of his motion for a new trial, was sentenced to serve fifteen years in the State Penitentiary. From such conviction and sentence this appeal was perfected.

The principal facts and circumstances surrounding the commission of the crime are as follows: For a number of years (apparently throughout his sixteen years of married life) the defendant was in financial difficulties. On or about May 9, 1963 he decided to rob the MacArthur Village Branch of the Guaranty Bank and Trust Company of Alexandria. In leaving his home that morning he told his wife that he was going to pay some bills. Later, she found him in a barroom drinking beer. When she threatened him with the statement that she intended to call the judge he left the barroom with her, together with their five children, and drove around the City of Alexandria in his automobile. While on this drive he stopped the car, went into a business establishment known as the Security Company, and purchased (in the fictitious name of George Wells) a .22 caliber pistol and ammunition for it.

He did not and would not tell his wife what he had bought (it was in a paper bag). He then drove to a service station, went into its rest room, loaded the pistol, and put it in his pocket.

After reentering the vehicle he went with his wife and family to the bank, at which place he (after alighting) told them that he was going to make a loan and suggested that they meet him "after a while" at the Cabrini Hospital. It was then about noon.

On his entering the bank its manager, Jack R. Wilder, was conferring with a customer; so the defendant waited until the conference was concluded. He then approached the manager, stating that he wanted to make a loan.

As they sat at the banker's desk, and when the loan application was about completed, the defendant pulled the gun from his pocket and demanded money. The sum of $11,750, all in paper currency, was taken by the manager from a teller's cage and given to him in a cloth sack.

Thereupon, the defendant forced Wilder to leave the bank and to drive off in the latter's car with him, he warning the other employees not to call the police or he would kill their manager.

When a short distance from the Cabrini Hospital he compelled Wilder to get out of the automobile. He then drove Wilder's car to the hospital where, after entering it, he went to the expectant father's waiting room on the second floor, wrapped the cloth sack containing the money in a newspaper, put his name on the package, placed it on top of the radio (or television), and walked to the hospital's first floor for coffee.

The police having been alerted, defendant was apprehended shortly thereafter. Immediately, he admitted his perpetration of the robbery and showed the officers where he had left the money.

Subsequently (on the same day), he gave a detailed, written account of his actions. It covered twenty-six pages, was admitted into evidence, and was considered by the jury.

During the course of the trial the defense introduced the report of the lunacy commission which, as we have heretofore noted, declared that the defendant was insane at the time of the commission of the crime. Thereafter, the individual members of such commission were called and questioned at length by the court, by counsel for defendant, and by the state's attorney.

This appeal presents only a single issue, the defendant having perfected but one bill of exceptions which was based on the refusal of the trial judge to grant his motion for a new trial. While such motion sets forth that several alleged irregularities occurred during the course of the trial, defendant has affirmatively abandoned all of

them except one, it being "* * * that said verdict is contrary to the law and the evidence in that the state failed to present any evidence tending to show the sanity of the accused at the time of the offense to rebut the prima facie correctness of the report of the Lunacy Commission established under Article 425 of the Criminal [Code of] Procedure; that the state, failing to present such evidence as a matter of law, failed to prove a substantial element of the crime." (Brackets ours)

LRS 15:425 (cited by defense counsel as Article 425 of the Louisiana Criminal Code of Procedure) provides: "The report of every commission of lunacy shall be prima facie evidence of the facts recited in such report and of the correctness of the findings of such commission."

■ Counsel for the defendant concede (as indeed they must in view of our settled jurisprudence) that the defense of insanity at the time of the commission of the crime presents a question of fact relating to the guilt or innocence of the accused to be determined by the jury. See State v. Eisenhardt et al., 185 La. 308, 169 So. 417, State v. Sample, 203 La. 841, 14 So.2d 678, State v. Basco, 216 La. 365, 43 So.2d 761, State v. Dowdy et al., 217 La. 773, 774, 47 So.2d 496, State v. Swails, 226 La. 441, 76 So.2d 523, and State v. Chinn, 229 La. 984, 87 So.2d 315.

Further, such counsel recognize that generally there is a legal presumption of sanity

and a defendant has the burden of rebutting it by a preponderance of the evidence. However, they argue that, pursuant to the provisions of LRS 15:425, the finding of the lunacy commission in the instant case overcame that presumption of sanity and established, prima facie, defendant's insanity at the time of the alleged offense; and that there is no evidence in the record which would rebut this prima facie showing. They contend, in other words, that there was no evidence tending to show (or from which the jury could conclude) that the defendant was sane.

■■ It is our established jurisprudence that (when a defendant offers the contention that there was no evidence to support his conviction) this court cannot weigh, or pass upon the sufficiency of, the evidence, such function being solely the prerogative of the trier of facts—in this case the jury. All that we can do is to examine the record to determine whether there was any admissible evidence at all upon which the jury could have predicated its verdict. If there was not, the conviction must be set aside; if there was, then the verdict must be sustained. As was well said in State v. Copling, 242 La. 199, 135 So.2d 271: "The complaint that a conviction is based upon no evidence at all presents a question of law, i. e., whether it be lawful to convict an accused without any proof whatsoever as to his guilt. It is only when there is no evidence at all of some essential element

of the crime charged that the .Court may set aside a verdict. *Where. there is some evidence to sustain the conviction, no matter how little, this Court cannot pass upon the sufficiency thereof. That comes within the exclusive province of the trial judge and jury.* \* \* \*" See also State v. Di Vincenti, 225 La. 689, 73 So.2d 806, State v. Bueche, 243 La. 160, 142 So.2d 381, State v. Cox, 244 La. 1087, 156 So.2d 448, and State v. Richard, 245 La. 465, 158 So.2d 828.

▬▬ With particular reference to the issue of the sanity or insanity of an accused as of the time of the commission of an offense, it is not determinable on the report of the sanity commission alone when there is other proof. Consideration must be given by the jury to all of the admissible evidence bearing on such mental condition—the commission's report, the testimony of the individual doctors who made up the commission, the opinions of other experts and of lay witnesses, the conduct and actions of the accused, etc.

▬▬ Thus, in State v. Swails, supra, it was held that the opinion of a lay witness as to the defendant's sanity on the occurrence of the crime could be considered by the jury. Again, in State v. Chinn, supra, this court took into consideration, in addition to the commission's report which stated that the accused was legally insane, the defendant's actions and conduct following his perpetration of a robbery, his detailed recollection and narration of his movements before and after the robbery,

and the testimony of lay witnesses. Also, in State v. Jenkins, 236 La. 256, 107 So.2d 632 the nature and contents of letters written by the defendant, along with other evidence, were taken into account in determining the issue of defendant's sanity. Further, in State v. Hebert, 187 La. 318, 174 So. 369, this court, after citing LRS 15:425, stated: "In State v. Patterson, 176 La. 440, 146 So. 17, it was held that *while the opinions of insanity experts are not conclusive,* they are of great value, and that the court is not warranted in arbitrarily substituting its own opinion for that of the experts. *It was further held that the court may hear testimony in rebuttal of that given by the experts and that the final conclusion* of the court as to whether the defendant is sane or insane *should be based upon the testimony as a whole.*" (Italics ours)

▬▬ It is true that in each of the last cited three cases the court was dealing with the plea of insanity as of the present, not one relating to the time of the occurrence of the crime. Nevertheless, the same facts support a finding of sanity or insanity (as the case may be) at either time. The difference in the two is, as pointed out in State v. Hebert and State v. Sample, both supra, that the plea of present insanity is triable by the judge alone, and it is reviewable by this court on the issue of whether such judge properly exercised his discretion; whereas, a plea of insanity as of the time of the occurrence of the crime affects the guilt or innocence of the accused and is triable solely by the jury.

Unquestionably, there is a paucity of jurisprudence from this court on the character of evidence which might be considered by the jury in determining the question of insanity at the time of the offense. Probably this is because (since the question is one for the jury) such evidence is not reviewable by this court except in a rare situation (such as occurs in this case) which permits its consideration under the "no evidence rule".

 Albeit, we are of the opinion that the following statement appearing in Wharton's Criminal Evidence, 12th Edition, Volume 2, Section 532, at page 379, succinctly states the proper rule: "In those jurisdictions where the 'right and wrong' test obtains in insanity [as it does in Louisiana, LRS 14:14, State v. Tapie, 173 La. 780, 138 So. 665], and such inquiry is permissible and proper, the fact that a person is unable to discriminate between right and wrong is best ascertained not by the opinion of any medical witness nor by any medical theory, but by the acts of the individual himself. And such acts and conduct on the part of one accused of crime, which show conclusively that he had sufficient reason to contemplate the act that he did, and its consequences, at the time he did it, are of more value as evidence on the question of capacity than the opinions of lay or expert witnesses." (Brackets ours)

Also supporting this view are the following observations in Underhill's Criminal Evidence, Fifth Edition, Volume 2, Section 456, pages 1143–1145: "* * * The demeanor of a prisoner after a homicide perpetrated by him, his coolness and lack of regret for his act, his physical appearance and condition, his language showing a motive or the lack of one, his attempt to conceal his crime or to escape, or his open boast that he committed the homicide and the reason for it, may be proved to show his mental condition. None of these facts is conclusive however, and the jury may discredit them and find the accused guilty. * * * The conversations and the declarations of the accused uttered within a reasonable period before or after the crime are admissible to show his mental condition at the date of the crime. * * * The jury may consider the cunning and sagacity displayed by the accused in planning the crime, the promptitude and courage shown in using a deadly weapon and the skill exhibited in effecting an escape. * * *"

 With these legal principles in mind we have examined the record herein and we find, as did the district judge according to his per curiam, that there was some evidence from which the jury could have determined that the accused was sane at the time of the crime's occurrence. Without objection by defense counsel, both the bank manager and an arresting officer were questioned concerning the appearance of the defendant. The former testified that he acted perfectly normal—just as any other

bank customer would have acted; that he perhaps appeared a little nervous, but no more so than most persons applying for loans. And Deputy Sheriff Lewis Meadows stated that he seemed to be completely rational at all times, that he talked coherently, and that he did not appear upset—just resigned to the fact he had been captured or caught.

Furthermore, the actions of the defendant immediately prior to the commission of the offense—purchasing of the pistol under an assumed name, going into an unoccupied rest room to load it, hiding it in his clothing, concealing it from his wife, and telling her he was going into the bank to obtain a loan —all were indications that he was conscious of the fact that what he was about to do was not right but was wrong. Likewise, his statement to the bank manager during the hold up that "I said 'Mr. I hate to do this, but I have got to do this. And I will not hurt you and don't give any alarm,'" and his taking the manager as a hostage, both tend to show his awareness that his conduct was wrong and that there could be serious consequences as a result of it. Also, his lengthy, twenty-six page, narrative confession is detailed, logical and clear.

On the other hand it is to be observed that while each of the members of the lunacy commission expressed the opinion that the defendant was insane, and could not differentiate between right and wrong, one of them gave the following testimony:

"Q. Well, assuming that he robbed a bank, put a gun on a man, ordered him to give the bank's money to him, would he realize that that was wrong at the time it occurred, if it occurred on May the 9th., 1963?

"A. He could have realized that it was wrong but have been driven to this or had the feeling of necessity to do it from some impelling reason which made him incapable of letting his rule of right and wrong determine his actions."

Another testified:

"Q. How long had he been in such a condition as to think that bank robbery was the right thing to do?

"A. I don't know that he thought that bank robbery was the right thing, but the fact he thought that it was right for him to get the money—he felt that (inaudible) he was trying to do this for his family. He felt that that was all the money he wanted, take care of his family and doctor bills."

And the third conceded that his opinion was based largely on what the defendant told him concerning the robbing of a bank, and that the date on which he fixed the insanity was "on the basis of what I took to be reliable testimony from the defendant."

It was also shown that the report of the three experts was predicated almost wholly on observation and interrogation of the accused, no formal psychological tests having been administered.

The aforediscussed testimony of the non-experts, as well as the accused's demeanor, conduct and actions and the nature and content of his confession, clearly constituted some evidence tending to establish the defendant's sanity; and it provided a basis for the jury to disregard the .formal. report of the lunacy commission and to find the accused sane. This being true, under the authority heretofore cited we are not permitted to weigh the evidence or to substitute our conclusion for that of the jury. Therefore, the conviction, since there is some evidence to support it, must be sustained.

For the reasons assigned the conviction and sentence are affirmed.