ODOM, J.
Defendant and Lawrence Bourg'were prosecuted for the crime of robbery. Both were convicted and sentenced to hard labor in the state penitentiary. The defendant Ashton Tapie appealed.
The errors complained of by appellant are set forth in two bills of exception. Defendant moved for a new trial on the ground that since his conviction he had discovered new evidence material to his defense. His motion was overruled, and bill No. 1 was reserved.
After conviction, he filed' a plea of present insanity, and asked that a lunacy commission examine him and make report to the court touching the question whether he was then sane or insane. The commission was appointed, and reported that he was then sane. The plea was set down for trial, and tried. The three members of the lunacy commission appointed by the court were summoned and testified, and, in addition to their testimony, that of a number of other witnesses was taken. After hearing all the testimony offered, the court rendered judgment declaring the defendant sane, and bill No. 2 was reserved to this ruling.
We find no 'merit in either bill.
In the motion for a new trial, defendant alleged that he had been arrested as a result of an anonymous letter written to the chief of police, which fact was not discovered until after conviction, and therefore could not be proved on the trial.
Such testimony was wholly irrelevant to any issue in the case. The source of the information upon which the officers acted in making the arrest could have no bearing upon the question of defendant’s guilt or innocence.
To entitle an accused to a new trial on the ground of newly discovered evidence, it must appear that such evidence is material, and that its introduction would probably bring about a different result. State v. Williams, 147 La. 715, 85 So. 650; State v. Ferguson, 114 La. 70, 38 So. 23; State v. Sloan, 120 La. 170, 45 So. 50.
The principal complaint urged by counsel1 is the one presented by bill No. 2, which was reserved to the ruling of the court holding that the accused is presently sane.
All the testimony introduced at the trial of the plea of present insanity, as well as-the report of the experts appointed by the court, is attached to the bill of exceptions, and is now before us for review. State v. Brodes, 160 La. 340, 107 So. 131; State v. Smith, 145 La. 913, 83 So. 189; State v. Moore, 140 La. 281, 72 So. 965, 968.
That the defendant was sane at the time this plea was tried is shown beyond question. The report of the experts is addressed to the District Judge, and reads as follows:
“Dear Judge: In response to your letter of March 4, 1931, creating a lunacy commission composed of Doctors Joseph O’Hara, L. L. Oazenavette, Charles S. Holbrook, to enquire into the present condition of one Ash-ton Tapie, now in Orleans Parish Prison, we beg to report as follows:
“We have examined physically and mentally said Ashton Tapie and find him to be sane.
“Our examination further shows, however, that Ashton Tapie is sub-normal mentally, having the intelligence corresponding to that of a child of nine to ten years of age and we-believe that he is not fully responsible.”
Dr. O’Hara, one of the experts, was called-as a witness and on page 102 of the record we find that he reiterated the statement made in the report signed by him and his associates that the defendant is sane. He said, “I said he was sane, the certificate says so. We examined him mentally and physically and find him mentally sane.”
He further said, “He may be sane in a medical sense, and still be unable to distinguish between right and wrong.”
He was asked if in his opinion defendant knew he was doing wrong when he committed the assault and robbery, and he answered, “No.” But what Dr. O’Hara had in mind is made clear by his answers to two subsequent questions. He was asked if he felt that defendant could commit robbery without real-, izing what he was doing, and he said, “He wouldn’t realize the gravity of it.” He was asked, “He wouldn’t know he was doing *667 -wrong?” and he said, “I don’t think he would know he was doing wrong. He would not know the gravity of it.”
The other experts, Drs. Holbrook and Caz-enavette, called as witnesses, expressed the unqualified opinion that defendant was sane. They, as well as,Dr. O’Hara, said that the man is subnormal mentally; that, although he is a man fully mature in years, he has the mind of a child nine to ten years old, measured by the ordinary intelligence test; that they found no trace of insanity, no disease of the mind, but a ease of arrested mental development.
Dr. Holbrook was asked if there was any ■doubt in his mind as to defendant’s responsibility, and he said:
“No. As to the degree of responsibility, I do not believe that a sub-normal boy like this is as responsible as the average adult of superior intelligence or average intelligence. I feel there is a difference. I do feel that he knows right from wrong in a legal sense.”
Counsel in oral argument and in brief say that the conduct of defendant at the scene and at the time of the robbery shows that he was insane.
We have carefully read the testimony of all the witnesses, those who were robbed and those who witnessed the holdup, and have failed to discover any act done by defendant indicating insanity. It iS/true, as pointed out by counsel, that defendant wore no mask, and, when he entered the drug store, his pistol, which he then held in his hand, was covered with a soiled rag. But, if we are to credit the stories which we read and hear, hijackers and holdup men frequently perform without masks. In this case Bourg, who was engaged with defendant in the robbery, was not masked.
According to the witnesses, defendant did the usual things when he and his companion entered the drug store. He drew his revolver and ordered the three men to throw up their hands and stand against the wall, which they did. The lady clerk turned pale and stood motionless. He then went to one of the cash registers and tried to open it, but failed. He then ordered the clerk to open it for him. When it was opened, he extracted and pocketed the contents.
The other cash register was opened, and he did likewise with' its contents. As he was leaving the building,'he extracted a-watch from the vest pocket of a customer who was still standing against Jhe wall, afraid to move.
A number of lay witnesses were called, some of whom were relatives. The sum and substance of their testimony is that defendant would not stay in school; that his teachers could do but little with him; that he is high tempered, and of a stubborn, rebellious disposition; that he has intelligence enough to do ordinary work, but won’t stick to any job long at a time. They, like the experts, say he is subnormal in mental development, but there is nothing in their testimony which indicates that he is mentally diseased or insane.
Bishop, in his new Criminal Law, § 396a, gives the following definition of insanity as that term is used in criminal law:
“One is insane who, from whatever cause, is incompetent to have the criminal intent or who is incapable of so controlling his volition as to avoid doing the forbidden thing.”
• “Insanity,” as the term is used in defense of an act which, if committed by a normal person, would be criminal, means such a deranged and perverted condition of the mental faculties as to render a person incapable of distinguishing between right and wrong, or such a disordered or distorted condition of the mind as to render the individual incapable of reasoning or of exercising the will.
Under our Civil Code, art. 31, “persons of Insane Mind are those who do not enjoy the exercise and use of reason, after they have arrived at the age at which they ought, according to nature, to possess it, whether the defect results from nature or accident.”
A person whose mind is so impaired or deranged, whether from nature or by accident or disease, as to render him incapable of reasoning, incapable of planning and acting, or of having knowledge of the nature and-quality of the act he is doing, incapable of realizing his responsibility to society and to others, in sum, incapable of distinguishing between right and wrong, is insane, and therefore immune from criminal prosecution and punishment.
The rule or test established in England and which prevails in this country is generally referred to as the “right and wrong” test, which means in simple terms that, if a person has the mental capacity to distinguish between right and wrong, he is responsible for his acts and may be punished.
 The defendant is not insane under any test which may be applied. He can reason, plan, act, execute. This is clearly shown by his maneuvers and conduct at the scene of the robbery, and no change has taken place since. It is no doubt true, as Dr. O’Hara says, he did not know or realize the gravity or seriousness of the act which he committed. But that is not the test. The test is whether he knew the nature and quality of the act done; whether he knew it was wrong. He unquestionably did.
The most that can be, and in fact that is, seriously said in his behalf is that he is mentally subnormal. But .immunity from crime cannot be predicated upon a merely weak or low order of intellect. In the ease of Commonwealth of Massachusetts v. Rich *668 ard Stewart, decided in 1926 and reported in 255 Mass. 9, 151 N. E. 74, 44 A. L. R. 579, the court said.
“Criminal responsibility does hot depend upon the mental age of the defendant nor upon the question whether the mind of the prisoner is above or below that of the ideal or of the average or of the normal man, but upon the question whether the defendant knows the difference between right and wrong, can understand the relation which he bears to others and which others bear to him, and has knowledge of the nature of his act so as to be able to perceive its true character and consequences to himself and to others.”
In a case note found in 44 A. L. R. 584, the general rule is stated as follows:
“As a result of the foregoing it is uniformly held that subnormal mentality is not a defense to crime unless the accused is by reason thereof unable to distinguish between right and wrong with respect to the particular act in question.”
In support of the rule thus stated, cases from sixteen states are cited.
In 14 R. C. L. p. 603, it is stated that: “The authorities are unanimous in declaring that, mere weakness of mind is not of itself sufficient to excuse the perpetration of a criminal act.”
The following is quoted from 16 C. J. 99:
“Thus all the courts, no doubt, agree that mere mental weakness does not exempt from responsibility where there is sufficient' ca-. pacity to know the act is wrong.”
In State v. Brodes, 160 La. 340, 107 So. 131, the defendant pleaded insanity. It was found that, while he was mentally of low grade, yet he had sufficient “reasoning power and judgment to know right from wrong,” and the conviction was upheld.
Eor the reasons assigned, the judgment and sentence appealed from are affirmed.