138 So.2d 569

STATE of Louisiana

v.

Roy Winford FULGHUM.

No. 45837.

Feb. 19, 1962.

Rehearing Denied March 26, 1962.

Thomas M. Comegys, Jr., Herbert C. Harrison, J. Bennett Johnston, Jr., Shreveport, for defendant-appellant.

Jack P. F. Gremillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., John A. Richardson, Dist. Atty., Albert S. Lutz, Jr., C. J. Bolin, Jr., Asst. Dist. Attys., Shreveport, for plaintiff-appellee.

HAMLIN, Justice.

The defendant was tried, convicted, and sentenced to death for the murder of William Massey, Jr. LSA–R.S. 14:30. He appeals to this Court from the conviction and sentence, presenting for our consideration seventeen bills of exceptions reserved during the course of trial.

The trial judge sets forth the facts of this case in his Per Curiam to Bills of

Exceptions Nos. 7 and 8;[1] we believe it appropriate to quote his recitation at the beginning of this opinion.

"Roy W. Fulghum, age 31, had been married to Christine Massey Fulghum, age 27, since 1956, they having two children ages 1 and 3. Fulghum and his wife lived at various addresses· in Shreveport after their marriage. On some occasions they lived with her parents, Ruby Massey, age 49, and William Massey, Sr., age 55; and on other occasions the Masseys lived with the Fulghums.

"Prior to * * * June 16, 1960, there had been quarrels between Fulghum and his wife, and also between Fulghum and his mother-in-law. He had had very slight difficulty with his father-in-law and there had been no prior trouble between Fulghum and his brother-in-law, William Massey, Jr., age 19. * * *

"As shown by the testimony, Fulghum had been placed under peace bonds at the Shreveport City Court on four separate occasions, between March 10, 1960, and May 20, 1960. All of these peace bond applications were initiated by his wife except one by his father-in-law. (None of them were begun by his mother-in-law or brother-in-law.) His wife had withdrawn one and his father-in-law had withdrawn the one he had instituted. When this was done, Fulghum was released from the Parish Penal Farm about June 2, 1960, although he was still under two other peace bonds (for periods of six months) begun by his wife in April and May. Mr. Massey secured Fulghum's release from the Penal Farm.

"While he was on the Parish Farm his wife had returned to her parents and lived with them, her children, and her brother in a small three room cottage apartment. Upon his release, Fulghum was not working, and on June 15th, while he was staying with the Masseys, he got into an argument with Mrs. Massey about his wife working at a tavern nearby. This was in the early evening after they had had a barbecue supper. After the argument, Fulghum packed his clothes in a suitcase, which· he hid under the house (unknown to the Masseys) and left the Massey home about 7:00 P.M.

"During the evening he went with a cousin to two different taverns and drank a small amount of beer. Likewise, at that time he went in a cab with this cousin to the home of Mr. and Mrs.

---

1. The complete testimony taken in connection with the Bills of Exceptions was not transcribed.

Wallace Smith where he borrowed a .22 caliber pistol, (the same one he later used in these killings) saying that he wanted to go on a frog hunt. He returned to the tavern and wrote a note on the back of a guest check, which read as follows:

" 'Would like for my kids to be left with my sister Mrs. J. R. Downing, 2859 Sunny Brook. Tell Mrs. & Mr. Fulghum I'm sorry I had to do this but its the only way out. I love my wife and I will take her with me. Thanks to every one that stood by me. I love them with all my heart. I know I have did wrong to all. I hope to God will forgive me. Love

" 'Roy'

"He telephoned a sister who lived in Shreveport and also a brother who lived at Keithville, about 15 miles from Shreveport, discussing his family troubles. They advised him to quit his wife or take it up with the Juvenile Court. He then went with his cousin to take the cousin home and, refusing his cousin's invitation to spend the night, he stated that he was going to get a room at The Shreveporter Motel (which is about two blocks from where the Masseys were living).

"He got out of the cab at the Shreveporter, walked down the side street to the Masseys' home, and went into the house. He was talking with his wife and when his mother-in-law said something to him he shot at her twice with the .22 pistol, killing her instantly.

"The brother-in-law, William Massey, Jr., who had been asleep on a bed, raised up to see what was going on and immediately Fulghum shot him twice, one bullet going through the surface of the skin on his back and the other one penetrating his brain.

"His wife reached for one of the children in the baby bed in a corner of the room and he shot her, killing her instantly. She slumped to the floor between the end of the baby bed and a large chair into which Mrs. Massey had fallen on her face.

"Mr. Massey, Sr. came from an adjoining room to see what was going on and he was shot by Fulghum, first in the abdomen and again as Mr. Massey turned and ran, he was shot once in the back. Mr. Massey got through a window in the other room and was later discovered on the ground a short distance away.

"As stated, the two women were killed instantly and the two men died the next day in separate hospitals."

## BILL OF EXCEPTIONS NO. 1

■ Bill of Exceptions No. 1 was reserved to the trial court's overruling of a

demurrer and motion to quash filed by the defendant.

The demurrer and motion to quash, filed prior to arraignment, averred that the indictment found against the defendant was apparently drawn under LSA–R.S. 15:235, and that insofar as the statute relates to the crime of murder it is unconstitutional, null, and void for the reason that it does not require the recital of any facts constituting a crime under the laws of Louisiana. Defendant contended that that part of the statute relating to murder deprived him of due process of law as required by the Fifth and Fourteenth Amendments to the Constitution of the United States and Section 2 of Article I of the Constitution of Louisiana of 1921, LSA. Defendant further contended that the statute violates Section 10 of Article I of the Constitution of Louisiana in that it does not require that a defendant be informed of the nature and cause of the accusation found against him.

The contentions advanced by defendant have been previously raised and decided adversely to his averments; the constitutionality of LSA–R.S. 15:235 has been set at rest. This Court has found that a murder indictment, drawn in short form, adequately informed the defendant of the nature and cause of the accusation. State of Louisiana v. James, 241 La. 233, 128 So.2d 21; State of Louisiana v. Delbert W. Eyer,

237 La. 45, 110 So.2d 521; State of Louisiana v. Leming, 217 La. 257, 46 So.2d 262.

Bill of Exceptions No. 1 is without merit.

## BILLS OF EXCEPTIONS NOS. 2, 3, 4 AND 6

■ Bill of Exceptions No. 2 was reserved to the overruling of defendant's objection to the excusing of the prospective jurors Curtis O. Baker and Louis Jackson Nelson for "business reasons" and the denial of a request for attachment.

Bill of Exceptions No. 3 was reserved when the trial court overruled defendant's objection to going to trial until such time as the jurors Neal Holt Womack, James Howard Jolley, George Edward Harper, John P. Brown, Richard W. Lodge, and John Simon LeBlanc were attached and brought into court.

Bill of Exceptions No. 4 was reserved to the trial court's overruling defendant's objection to the calling of any tales jurors until such time as the jurors on the regular venire had been duly attached in accordance with Article 346 of the Code of Criminal Procedure, LSA–R.S. 15:346 and their attendance enforced in the court at that time.

Bill of Exceptions No. 6 was reserved to the overruling of defendant's objection to the calling of any tales jurors until attachments were made against absent jurors and some cause shown for the absence of the

jurors on the regular venire. Defense counsel averred that this bill was taken in order to preserve defendant's rights under Bills of Exceptions Nos. 2, 3 and 4.

In his Per Curiam[2] to the above bills, the trial judge sets forth the following circumstances leading to their reservation:

"In this case, the jury venire consisted of fifty names drawn by the Jury Commission for the trial of jury cases for the week beginning February 6, 1961, pursuant to order of Court. Of this number, the Sheriff's returns showed that six persons were not found. Of the remainder, and *upon personal application by the individual jurors themselves to the Court,* ten persons were excused for jury service for the week. Included in this latter ten were two jurors named Curtis O. Baker and Lewis Jackson Nelson.

"On the day of the trial and in Open Court, one of the defense counsel asked the Court to state its reasons for having excused ten jurors in the venire of fifty men. The Court stated its reasons as to each excused juror. These reasons were accepted as satisfactory and sufficient by defense counsel as to eight jurors but objection was made to the excusing of the two jurors named in Bill Number 2. Attachments for the absent jurors were requested, which request was denied, and Bill reserved (Bill Number 2).

"As to the six jurors who were not found by the Sheriff (named in Bill Number 3) the defense made three objections and reserved Bills Number 3, 4, and 6. Defense counsel objected to going to trial until the six persons not found were attached and brought into court (Bill Number 3); and likewise objected to the calling of tales jurors until the same six jurors were attached and their attendance in court enforced (Bill Number 4); and finally the defense reiterated their objections, after the regular venire was exhausted, to proceeding to the examination of tales jurors until the attachments for the six jurors not found were issued (Bill Number 6).

"Additionally, (but no objection was made in relation thereto) one juror on the regular venire did not appear and it was learned that through some error he had been notified to appear for the week beginning February 13, 1961, (the following week). As stated, this juror was excused and no bill was reserved in connection therewith. Thus, the jury venire was reduced to Thirty-three names, from which was to be obtained a jury of twelve persons. Therefore, at the beginning of the

2. The trial judge discussed his rulings on the four bills in one per curiam.

trial it appeared to the Court that it would be possible to obtain a jury of twelve persons from the remaining thirty-three names, as frequently such juries are selected in murder cases in this District and are obtained from venires when only twenty-three or twenty-four names remained after the names of jurors not found and excused are eliminated.

"During the course of the empaneling of the jury the *defendant exercised only ten peremptory challenges* and the State exercised only five at the time the twelve jurors were accepted. One alternate juror was selected (although he was discharged before the jury retired) and no peremptory challenge was exercised by either the State or the defense in the selection of an alternate juror."

Counsel for the defendant contend that he was deprived of his rights under LSA–R.S. 15:343–344–345–346 by the trial judge's rulings; these statutes recite:

"The venire is the body of persons selected to serve as jurors during a certain designated term; the panel is the jury selected, impaneled and sworn to try a particular case." LSA–R.S. 15:343.

"Subject to the provisions of this Part, the defendant has the right to demand that all jurors in the regular venire shall be tendered for acceptance or rejection at the trial of his case." LSA–R.S. 15:344.

"It is within the discretion of the judge to excuse for cause jurors of the regular venire." LSA–R.S. 15:345.

"Before going to trial the prosecution or the defense may demand attachment for all jurors of the regular venire who are absent, but if there be enough jurors present to make up the panel such attachments can not be demanded of right." LSA–R.S. 15:346.

In the case of State v. Gould, 155 La. 639, 99 So. 490, the required panel was seventy-five jurors; thirty-seven were excused by the trial judge. In upholding the exercise of the trial judge's discretion this Court stated:

"There is nothing in the record in the instant case to show upon what ground the 37 jurors drawn to make up the panel of 75 were excused by the court, and in the absence of such showing we must assume that the trial judge had good, sufficient, and satisfactory reasons for excusing them, and having excused them it was useless to have included their names on the list which was served on the defendant.

" * * * There is nothing in the jury act which takes away from the judge the discretion to excuse jurors from service for any reason that to

him may be proper and satisfactory. And the exercise of this discretion will not be interfered with on appeal unless it clearly appears that the right has been abused or that the defendant has been prejudiced thereby. * *"

In the case of State v. Jugger, 217 La. 687, 47 So.2d 46, Bills of Exceptions Nos. 1, 2 and 3 were based upon the asserted error of the trial judge in overruling defense counsel's objection to the commencement of the trial on the ground that of the fifty names included on the jury panel only eighteen appeared for service, the judge having previously excused the others for cause. Subsequently, when the jury panel was exhausted, counsel objected to the order of the court that the tales jury box be opened and summons issued. This Court found no merit in the bills and stated:

> " * * * It is entirely within the discretion of the trial judge to excuse jurors of the regular venire for cause. Article 345, Code of Criminal Procedure, and, in the absence of a showing of fraud or collusion and material injury to the accused, the ruling of the judge on an objection to the panel will not be disturbed. Article 203, Code of Criminal Procedure; State v. Gould, 155 La. 639, 99 So. 490; State v. Dallao, 187 La. 392, 175 So. 4. Furthermore, since appellant did not exhaust all of his peremptory chal-

lenges, he does not show that he was forced to accept an obnoxious juror. Hence, he has not been prejudiced by the adverse rulings. State v. Farrer, 35 La.Ann. 315; State v. Messer, 194 La. 238, 193 So. 633." See, State v. Michel, 225 La. 1040, 74 So.2d 207.

Under the circumstances of the present case, as they existed at the time the bills were reserved, we do not find that the trial judge abused his discretion in his rulings, nor do we find that the defendant suffered prejudice (LSA–R.S. 15:557) or injury from fraud or collusion. At the inception of trial defense counsel did not demand an attachment of the missing jurors; it would have impeded the trial of the case if the sheriff, who did call the names of the missing jurors at the Court House door, had gone out to look for them at the time the bills were reserved. Likewise, at the commencement of trial the judge was satisfied that the jury panel was sufficient; only later did it become necessary to summon tales jurors. The rulings of the trial judge were in accord with the quoted jurisprudence and shall not be disturbed.

Bills of Exceptions Nos. 2, 3, 4 and 6 are therefore without merit.

BILL OF EXCEPTIONS NO. 5

■ Bill of Exceptions No. 5 was reserved when the trial court overruled defendant's objection to the court's excusing

the prospective juror J. E. Shaw on the ground that he did not satisfy residence requirements. LSA–R.S. 15:172.

Shaw was transferred by his company; when he left Caddo Parish he thought the transfer was permanent, but he filed no affidavit nor intention to change his domicile at his new location; he was transferred back to Caddo Parish approximately six months before the instant trial. Defense counsel contended that Shaw was a duly qualified elector and juror for Caddo Parish, relying on Articles 41 and 42 of the Revised Civil Code, LSA.

We do not find that the trial judge abused his discretion or committed reversible error in excusing the prospective juror J. E. Shaw because he had not been a bona fide resident of Caddo Parish for one year next preceding the instant trial, nor do we find that the defendant suffered prejudice by his ruling.

Bill of Exceptions No. 5 is without merit.

## BILLS OF EXCEPTIONS NOS. 7 AND 8

■ Bill of Exceptions No. 7 was reserved to the overruling of defendant's objection to the admission in evidence of a question and answer statement, admitting culpability to the instant crime, made by the defendant at approximately 4:00 A.M., June 16, 1960, to Dr. Stuart DeLee, Deputy Coroner, Caddo Parish.

It is the contention of defendant that he was laboring under a condition of extreme emotional upset and was in no physical or mental condition to make any intelligent statement. LSA–R.S. 15:451–452. Defense counsel contended that a tape recording made immediately prior to the giving of the statement discloses defendant's condition, and that it also shows that the alleged confession, or statement of the defendant, was not transcribed in its entirety, being in contravention of Article 450[3] of the Louisiana Code of Criminal Procedure. Defense counsel submitted that it was incumbent upon the State, when it was shown by questions propounded by counsel for defendant, to offer some reasonable explanation as to what occurred during the times when the tape recorder was allegedly cut off and no record was made of what the defendant or the coroner said during that period of time.

Because of the importance of this bill, we quote the following colloquy outside of the presence of the jury at the time that it was reserved:

"MR. HARRISON: I do not know whether it is proper at this time, under

---

3. "Every confession, admission or declaration sought to be used against any one must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford." LSA–R.S. 15:450.

the way we are proceeding, but I do want to enter a vehement objection to the offering of the statement taken in the Coroner's office, for the reason that during the lunch-hour I went up to the Coroner's office and listened to part—I did not have time to listen to all of it—but the tape will speak for itself in showing that this defendant was in no condition, either mental or physical, at the time this statement was taken.

"Furthermore, it is obvious, from listening to the whole tape, which is not reproduced on this written portion here that is attempted to be offered in evidence, that there was more took place than is written on this paper here. For example, it is obvious that the statement was not volunteered; he was requested, on one occasion, to to give a statement, and he definitely said 'No.' Again he was requested, and he broke down and cried and said he would make a statement if he could see his wife. Then, obviously, in between these times the machine was cut off and I don't know what happened during the period it was cut off and then would be cut back on.

"Another time, he was asked if he was ready to make a statement, and he said he might as well, he had no choice in it, anyhow.

"And then finally, the last time,—after, I guess, he was beaten down, is the only thing I can figure out—he was requested to make a statement and he finally said that he would; and that is where this written part of the statement here begins.

"Now, I vehemently object to the offering of this statement in evidence. I ask that a subpoena duces tecum issue instanter, ordering the Coroner of this parish to produce the tape in court here, and I respectfully request that the Court listen to this tape and verify what I have just told the Court, and then sustain the objection to the offering of this statement.

"THE COURT: You were given permission to get it.

"MR. HARRISON: I went up and listened to it in the Coroner's office.

"Any way that it is brought to the Court's attention, but I do want, at the proper time, depending upon the Court's ruling, that that tape be available for offering in evidence.

"THE COURT: If you want to offer it, you better offer it.

"MR. HARRISON: I don't want to now, Your Honor; I want to wait and see what the Court's ruling is going to be.

"THE COURT: Well, I've got to rule on what I have heard here, not what is up in the Coroner's office.

"MR. HARRISON: We would like for the Court to listen to the tape. I do not have to offer it in evidence for the Court to listen to it, just as these statements were not offered in evidence until all the witnesses had come in and testified as to their part in the making up of that statement. I now ask that the Court listen to our part in tearing it down, so to speak.

"THE COURT: I will listen.

"(Tape played to Court)

"MR. HARRISON: We do not know what happened during the time that that machine was cut off, as it obviously was, in between the various times that he kept asking him if he wanted to make a statement, and finally he said, 'I guess I might as well, I got no choice.' It is obvious, also, that he was in an awful mental state; he was crying, he was breaking down, his voice was shaking. The man was obviously in no state to make a statement and it was not voluntary; he was beat over the head, so to speak, to make it.

"We object to the filing of that statement.

"MR. RICHARDSON: Now, if the Court please, Your Honor will recall the testimony of the witnesses this morning, one of whom was Mrs. Frye, who is here in the courtroom. She operated the machine; she has testified that this statement, in full, was read back to Roy Winford Fulghum at eleven-fifteen (11:15) in the morning, which was some seven (7) hours later; that he said it was correct, and he signed it. We think that the objection would go to the effect rather than the admissibility of the statement, because he read it some seven (7) hours later and, if I remember the testimony correctly, Mrs. Frye testified that she, herself, read it back to him.

"MR. HARRISON: If its inception was invalid, Your Honor, it could not be made right thereafter. I want to also direct Your Honor to this remark on that tape where he was asked to hold up his right hand and be sworn; he said he couldn't do it, he could hold them both up. Now, the obvious import of that statement is, that he was still handcuffed, despite the fact that all these officers say that he was not. He was still in durance vile; he was not in a position to make a free and voluntary statement.

"THE COURT: I do not know of any law that says that a man handcuffed cannot make a free statement.

"Let the objection be overruled and the statement be offered in evidence.

"MR. HARRISON: To which ruling the defendant reserves a special Bill of Exception.

"Now, if Your Honor please, in connection with this Bill of Exception, we ask that the tape itself be filed in evidence.

"THE COURT: Can't you have that transcribed?

"MR. HARRISON: Your Honor, you can't transcribe what is on that tape. It just cannot be put on paper. I know that tape contains a lot of other things other than this particular case here—

"THE COURT: I just asked the question. If you want to file it, in evidence, file it in evidence.

* * * * * *

"(D-1 filed in evidence)"

Bill of Exceptions No. 8 was reserved to the overruling of defendant's objection to the admission in evidence of an additional statement, admitting the commission of the instant crime, made by the defendant at 11:15 A.M., June 16, 1960, in the Coroner's Office in the presence of Sgt. J. S. Hoppe, Sgt. Paul O. Sandlin, and Dr. W. P. Butler; and a Police Statement, admitting guilt, allegedly typed and signed at one sitting at 6:30 A.M. on June 16, 1960.

Counsel for the defendant contended that the statements were inadmissible for the same reasons set forth, supra, in Bill of Exceptions No. 7, and for the additional reason that they were not the best evidence of what they purported to contain, the tape recording being the best evidence.

The following statement[4] is contained on the tape which counsel for the defendant offered in evidence and precedes the defendant's confession or question and answer statement made at 4:00 A.M., June 16, 1960, to Dr. DeLee (Bill of Exceptions No. 7):

"Q. Do you want to make a statement and tell us how this happened?

"A. I'd rather wait.

"Q. Are you willing to make a statement now and tell us how this happened?

"A. No.

"Q. You don't want to make any statement at all?

"A. I'll make one, but I just ain't got my mind right now.

"Q. Well, do you want to make a statement in the next minute or two, is that it?

4. The author of this opinion transcribed the statement from the tape recorder; the recording was played in open court during oral argument and later played several times during study of the appeal.

"A. If I could see my wife, I'd make one. (Accused weeps and there is a pause for twelve seconds.)

"Q. All we want to know is how this happened, now do you want to make a statement?

"A. I can't make one now. (Accused weeps; then there is a slight noise resembling a click.)

"Q. Are you willing to make a statement?

"A. Yes, I'm willing to make anything, I ain't got no choice, so what.

"Q. Alright, raise your right hand, please, sir. Can you raise your right hand?

"A. I can raise both hands.

"Q. Alright, do you swear to tell the truth, the whole truth, and nothing but the truth, so help you God?

"A. Yeah, I guess so.

"Q. Alright, tell us everything about this shooting that happened tonight."

The above quoted transcription consumes approximately one minute, ten seconds.

In his Per Curiam to Bills of Exceptions Nos. 7 and 8, the trial judge explains as follows his reason for admitting in evidence the three statements, supra:

"The initial arrest at the scene was made between 1:00 and 1:30 A.M. on June 16, 1960, the shootings having taken place between 12:30 and 1:00. At approximately 4:00 A.M., in the coroner's office in the Parish Court House in the presence of Detectives Russell and Roberson, Fulghum made to Dr. DeLee on the recording machine what has been referred to as the first coroner's statement.

"When the typist of the coroner's office, Mrs. Frey, came to work that morning she typed the first coroner's statement and at 11:15 A.M. Fulghum was brought to the coroner's office by Officers Hoppe and Sandlin (who had not been connected with the case and were merely transferring Fulghum from the Police Station to the Parish Jail).

"At that time and place, Mrs. Frey read the statement back to Fulghum in the presence of those two officers and also in the presence of Dr. Butler who saw Fulghum read the statement and sign it. Fulghum then and there stated that he wanted to add to his statement and so a second or supplemental coroner's statement was taken on the recording machine by Dr. Butler, in which Sandlin and Hoppe were present.

"It was likewise typed by Mrs. Frey and, later on that day, Fulghum was returned to the coroner's office by Deputy Sheriff George D'Artois (who was not

connected with the case) and there in the presence of D'Artois and Mrs. Frey the second statement was read to Fulghum, he said it was correct, and he signed it.

"Meanwhile, after the first corner's statement was taken between 4:00 and 5:00 A.M., Fulghum had been returned to the Shreveport Police Department and about 6:30 A.M. he made another voluntary statement to Detectives Russell and Roberson. This statement was typed by Sgt. Joe Russell in the Juvenile Office at the Police Station (not within the jail), Russell and Roberson being present at all times when this statement was made, and Sgt. Carroll being present part of the time.

*"On the trial of the case, both outside the presence of the jury while the State was laying the foundation therefor, and later in the presence of the jury,* all of the persons who were present at any time the two coroner's statements (and the police statement) were made by Fulghum, testified. This included the coroner, two deputy coroners, all of the police officers, the coroner's typist, and the deputy sheriff who brought Fulghum from the jail for the signature on the second coroner's statement. *All of these persons stated that there were no threats, promises, force, intimidation or duress used by anyone to get Fulghum to make any of the statements.*

\* \* \* . \* \* \*

"The real attack made by defense counsel in Bills Number 7 and 8 to the first coroner's statement is based upon an imaginary supposition that something may have transpired in the coroner's office between the time the deputy coroner gave his customary warning to the accused and the time that the deputy coroner placed the accused under oath for the purpose of giving a statement (he having said he wished to make a statement).

"It is true that at that time the accused had been drinking some and that he was in an emotional state. It was not surprising that he was in an emotional state since he had shot four people and he had been informed that his wife and his mother-in-law were dead.

"But this imaginary supposition on the part of one defense counsel cannot prevail over the positive testimony of Dr. DeLee, Dr. Mauroner, Sgt. Russell and Sgt. Roberson. This is particularly true since he was returned to the coroner's office some seven hours later by two other officers, Sgt. Hoppe and Sgt. Sandlin, who wer' not connected with the case and there in their presence and in the presence of Mrs. Frey, the coroner's typist, and Dr. Butler,

Parish Coroner, he read his original statement, said it was correct, and even wanted to add to it.

"This he was allowed to do and then when he was brought downstairs to the coroner's office some several hours later by a deputy sheriff, he read the second coroner's statement (which he had volunteered himself) and, saying it was correct, he signed it in the presence of the deputy sheriff (merely a custodian officer) and in the presence of Mrs. Frey, the typist.

\* \* \* \* \* \*

"The defendant had several opportunities to withdraw any statement made by him. This he did not do. Moreover, while the State was laying the foundation showing voluntary nature of all of these written statements out of the presence of the jury, the defendant did not take the stand for the limited purpose of showing persuasion, coercion or intimidation, *and the defendant did not offer any other item of evidence in support thereof.*

"It should be pointed out that the main defense in this case was a plea of insanity at the time of the commission of the crime. On this defense (as on all others) the defendant had a full and fair hearing before the jury and his efforts to present that matter by various witnesses, including a psychiatrist and a psychologist, were not hindered in any way.

"The only time that any attack upon any of the defendant's statements (written or oral) ever came up was when one of the defense counsel listened to a portion of the tape recording of the first coroner's statement during a part of the noon recess on one day of the trial. This is the slender thread upon which he bases the attack.

"But, as stated hereinabove, he was able to fully cross examine all persons who were present at the time that statement was made. *Not only that, but likewise he presented his contention in this connection to the jury and the jury likewise found that the statement was free and voluntary and was not affected by any claim of persuasion, inducement, coercion or duress.*

"All of the witnesses testified that there was no force or threats used by anyone upon the accused. The Deputy Coroner testified that when Fulghum asked about seeing his wife, Fulghum was refused permission to see her. Therefore, there was certainly no promise, inducement or persuasion on that score. Instead of being given an inducement, he was specifically refused.

"Moreover, the accused during the trial was able to present this matter in

a manner more favorable to himself than to the State, as only the quoted portion of the tape recording was . played before the jury and the remainder thereof was not played to the jury. Nevertheless, the jury apparently agreed with the Court that the statement was voluntary.

"Furthermore, the State proved by witnesses each and every fact stated in the confessions, except what occurred at the Massey home on the night of the killing." (Emphasis ours.)

■ Counsel for the defendant do not deny that the defendant made the three statements involved; they do not deny that the testimony recited by the trial judge in his Per Curiam was given;[5] they do not deny that the events described by the trial judge as taking place after the shootings and killings occurred; they contend that defendant could have been coerced during the pause and after the click on the tape (the averment is made that the tape was cut off), but during the hearing on the admissibility of the statements and during trial they presented no evidence other than the tape, supra, to prove defendant's mental and emotional condition at the time the statements were given.

"The question of the admissibility of the confessions addressed itself to the trial judge, and his ruling will not be disturbed unless it is clearly against the preponderance of the evidence. State v. Cook, 215 La. 163, 39 So.2d 898; State v. Palmer, 227 La. 691, 80 So.2d 374. * * *" State v. Peart, 232 La. 111, 93 So.2d 920. See, State v. Goins, 232 La. 238, 94 So.2d 244.

"Whether a confession is given freely and voluntarily is a question of fact, which addresses itself to the discretion of the trial judge. * * *" State v. Edwards, 232 La. 577, 94 So.2d 674.

"It is well settled in the jurisprudence of this State that admission involving the existence of criminal intent or inculpatory facts are governed by the rules applicable to confessions. * * * Before a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. State v. Richard, 223 La. 674, 66 So.2d 589; State v. Hilliard, 227 La. 208, 78 So.2d 835; LSA–R.S. 15:451.

"The question of the admissibility of a confession is for the judge, its ef-

5. The record does not contain a transcription of the testimony to which the trial judge referred.

fect for the jury, and whether a sufficient basis was laid for the admission of an alleged voluntary confession is a question of fact upon which the ruling of the trial judge will not be disturbed unless clearly against the preponderance of the evidence. See State v. Cook, 215 La. 163, 39 So.2d 898; State v. Hilliard, supra." State v. Domino, 234 La. 950, 102 So.2d 227.

" * * * the admissibility of a confession in evidence is predicated upon the state's establishing its free and voluntary character by proof that is direct and positive, and, under our jurisprudence, this fact must not only be established to the satisfaction of the trial judge out of the hearing of the jury but his ruling with respect thereto will not be disturbed on appeal unless clearly not supported by the evidence. Once in evidence, of course, it is for the jury to say what weight shall be accorded a confession." State v. Robinson, 215 La. 974, 41 So.2d 848; State v. Joseph, 217 La. 175, 46 So.2d 118. See, State v. Walker, 229 La. 229, 85 So.2d 497.

" * * * It occurs to us that the shackling or handcuffing of a prisoner who is to be charged with the serious crime of murder is an ordinary and customary procedure and counsel have not referred us to any decision by any court in which such an act would be considered as the use of force, threat, or intimidation which would invalidate an incriminatory statement made by a prisoner." State v. Dowdy, 217 La. 773, 47 So.2d 496. See, State v. Joseph, 217 La. 175, 46 So.2d 118.

"The circumstance that the defendant made the confessions under great mental stress induced by apprehension arising from the situation in which he found himself does not make the confessions involuntary. Evidence tending to show his weak mentality, feeblemindedness, and mental stress does not affect the admissibility of the confessions, but rather is a matter that bears on the weight, credibility, and effect to be given the confessions by the jury. * * *" State v. Stewart, 238 La. 1036, 117 So.2d 583.

The reasons set forth by the trial judge in his Per Curiam, supra, for admitting the three statements in evidence, clearly show that he properly applied the principles of law stated in the foregoing cases. We find that the preponderance of evidence was to the effect that the three statements were voluntarily given by the defendant; that a proper foundation was laid for their admission; and that weight and effect (as well as the tape) were considered by the jury. Under these circumstances, we find that the rulings of the trial judge were correct and that he properly overruled the

objections of counsel for the defendant to the admissibility of the statements in evidence.

Bills of Exceptions Nos. 7 and 8 are without merit.

## BILL OF EXCEPTIONS NO. 9

■ Bill of Exceptions No. 9 was reserved when the trial court overruled defendant's objection to the offering in evidence of State's Exhibit No. 10, a picture of the victim of the instant homicide, William Massey, Jr.

Defense counsel submitted that the picture was gruesome in nature served no useful purpose, and had no probative value, being designed only to inflame the jury and prejudice the defendant. Counsel contended that the position of the body was of no importance in proving the State's case since they thought the mere fact of death was sufficient.

In his Per Curiam to Bill of Exceptions No. 9, the trial judge describes the picture as follows:

"It is a picture of a young white boy lying almost entirely on his left side, at an angle cross ways on a regular bed, with the head in the direction of the window and the feet in the direction of the center of the room, the body being entirely upon the bed. The body is partly covered with bed clothes with only a small portion of his

under shorts showing at one place in the picture. The legs, one arm, the head and part of a shoulder are seen in the picture. The torso was completely covered by a quilt. There is no blood showing in the picture and no visible wounds."

The trial judge further states:

"These shootings took place shortly after midnight on June 16, 1960. This was a summer evening with five persons, besides the accused, living in a small three room cottage. Apparently the young Massey boy had gone to bed and was sleeping only in his shorts on a hot night. At the time the picture was taken, several officers testified positively that the person of William Massey, Jr. had not been moved and immediately thereafter he was sent to the hospital in an ambulance. Therefore, it was not a dead body, it was not unclothed in the sense of being naked, and certainly was not a gruesome picture."

■ We have examined this picture which was submitted to this Court as a part of the evidence attached to this bill of exceptions, and we do not find it gruesome, morbid, or of any other character as would prejudice the jury. State v. Miller, 237 La. 266, 111 So.2d 108. The trial judge further sets forth in his Per Curiam that

the District Attorney stated that "the probative value of the picture was to show the location of the person who ·was later the deceased for whose death the accused was on trial, and by that location to show in connection with any possible claim of self defense, that the young Massey boy was lying in bed at the time the shooting took place, and further to assist the jury in locating the various items within the house, including the position of the people at the time the shooting occurred."

"The admission of photographs and the use to be made of them on the trial must necessarily rest largely within the discretion of the trial judge, who can determine whether they serve a proper purpose in the jury's enlightenment. * * *. Photographs, whether original or copies, are admissible as primary evidence upon the same grounds and for the same purposes as are diagrams, maps and drawings of objects or places. Generally, photographs which go to illustrate any fact or shed light on an issue, or are relevant to describe person, place or thing involved, are admissible. * * *" State v. Johnson, 198 La. 195, 3 So.2d 556. See, State v. Goins, 232 La. 238, 94 So.2d 244; State v. Eubanks, 240 La. 552, 124 So.2d 543.

Bill of Exceptions No. 9 is without merit.

## BILLS OF EXCEPTIONS NOS. 10, 11 AND 12

Bills of Exceptions Nos. 10, 11 and 12 were reserved when the trial judge overruled the objections of counsel for the defendant to similar questions propounded to Dr. W. A. McBride, Jr., Dr. Andrew J. Mullen, and the Parish Coroner, Dr. Willis P. Butler.

■ The circumstances connected with the reservations of the bills were to the effect that the defendant was arraigned and pleaded "Not Guilty by Reason of Insanity at the Time of the Alleged Commission of the Crime Charged." A Sanity Commission was appointed to examine the accused and report to the court, according to law, its findings as to defendant's present mental condition and as to the mental condition of the accused at the time of the commission of the crimes. (On this appeal, we are considering only one of the crimes.) The report of the Sanity Commission concluded:

"As a result of all of this it is our opinion that Mr. Fulghum is not legally insane; he knows right from wrong; he can realize and appreciate the usual, natural and probable consequences of his actions; he understands the charges against him and he is mentally capable of assisting his attorney in the preparation and defense of his

case. These findings apply both presently and at the time of the commission of the crime charged.

"Respectfully submitted;

"W. A. McBride, M.D.;
Psychiatrist

"Andrew J. Mullen, M.D.;
Psychiatrist

"Willis P. Butler, M.D., Coroner of Caddo Parish"

During trial (outside of the presence of the jury) the following question was propounded to Dr. McBride:

"Dr. McBride, my question is this: Would you tell the jury—of course, the jury is excused, right now—but will you tell the jury what is your professional opinion, based upon the observation that you have made, as to whether or not Roy W. Fulghum, on the night of June fifteen (15), 1960, and the morning of June sixteen (16), 1960, within the meaning of the law, was sane or insane?"

After objection, the State rephrased the question to ask:

"Dr. McBride, based upon your observation of the accused in this case—Roy W. Fulghum—as you have related, I want to ask you this question: Whether or not, on the night of June 15th, 1960, and the morning of June 16th, 1960, whether the circumstances indicated that, because of a mental disease or mental defect, Roy Fulghum was incapable of distinguishing between right and wrong with reference to the conduct in question?"

Counsel for the defendant objected to the rephrased question, contending " * * * that that is the ultimate question to be decided by the jury. It is a legal question, just in different phraseology, and is not a psychiatric question at all."

Substantially the same rephrased question as was propounded to Dr. McBride was propounded to Drs. Mullen and Butler; counsel for the defendant raised the same objections, which were overruled.

In brief, counsel for the defendant submit:

"To sum up, we emphasize that these three medical witnesses were NOT asked whether, in their opinions based upon their expert qualifications and their examinations, the accused was, at the time in question, incapable, because of a mental disease or mental defect, of distinguishing between right and wrong with reference to the conduct in question, but whether the circumstances (of that night) indicated (to them) that because of the mental disease, etc.

"It is respectfully submitted that the question propounded to these three

different medical witnesses, particularly as restricted, called not for a medical opinion, but for a legal conclusion which was the sole function of the jury to form and constituted an unwarranted invasion of the province of the jury, highly prejudicial to this defendant, and thus constituting reversible error."

LSA–R.S. 14:14 recites:

"If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility."

We find that the trial judge, in finding that the question followed the language of LSA–R.S. 14:14, correctly overruled the objections of defense counsel; we agree with his reasons, which recite:

"* * * The second question, as rephrased and as used continually by the District Attorney thereafter follows the language of Article 14 (Insanity) of the Louisiana Criminal Code. In fact, the District Attorney read from the Code the Article itself in propounding those questions. Under these circumstances, the court feels that the question was not improper and that no error was committed.

"In fact, the court knows of no better way for the question to be asked or for the jury to receive the professional opinion of the psychiatrist than to use the language of the Insanity Article of the Criminal Code."

Bills of Exceptions Nos. 10, 11 and 12 are without merit.

## BILL OF EXCEPTIONS NO. 13

■ Bill of Exceptions No. 13 was reserved when the trial court refused to give Special Charge No. 12 requested by the defendant, which read as follows:

"Any person charged with an offense for which the penalty is or may be capital punishment who, upon trial, is found not guilty by reason of insanity or mental defect shall be committed by the Judge to a State mental institution. No person so committed shall be released from the State mental institution except on the order of the same Court which ordered his committment based upon a determination that such person is no longer criminally insane or a menace to society."

When this charge was requested, the jury had retired but had not started to deliberate. After the jury commenced its deliberations, it returned to the courtroom for further instructions; the trial court then read specifically the requested charge —Special Charge No. 12.

Counsel for the defendant argue:

"* * * it should have been given at the time requested, and at the time all the other charges and instructions were given. It is true that after the jury had deliberated for some time they returned to court and requested further instruction of the court relative to the effect or results of certain verdicts which they were empowered to render. At this time, the court did give the above instruction, but we respectfully submit that it came too late at the time it was given to have been of any benefit to the defendant. In other words, this charge was given as a sort of afterthought by the court and the jury could not have possibly been as impressed with its importance as they would have been if it had been given along with the other charges."

In his Per Curiam to Bill of Exceptions No. 13, the trial judge states that he refused to give the special charge because he did not think that it was wholly pertinent. State v. Morris, 222 La. 480, 62 So. 2d 649; State v. Swails, 226 La. 441, 76 So.2d 523.

We do not believe that it is necessary for us to pass upon the above reasoning of the trial judge; he gave the requested charge when the jury returned for further instructions. Under such circumstances, the defendant suffered no prejudice (LSA–R.S. 15:557) and no reversible error was committed.

Bill of Exceptions No. 13 is without merit.

## BILLS OF EXCEPTIONS NOS. 14 AND 15

Bill of Exceptions No. 14 was reserved to the trial court's refusal to give Special Charge No. 14 requested by defense counsel, which read:

"The difference between murder and manslaughter is not in the existence or absence of an intent to kill, but in the existence or absence of malice or forethought."

Bill of Exceptions No. 15 was reserved to the trial court's overruling the objection of defense counsel to the following portion of the general charge, which was given immediately after the trial judge had read the definitions of murder and manslaughter (LSA–R.S. 14:30–31) [6] to the jury:

6. LSA–R.S. 14:30: "Murder is the killing of a human being,

"(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

"(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated arson, aggravated bur-glary, aggravated kidnapping, aggravated rape, armed robbery, or simple robbery, even though he has no intent to kill.

"Whoever commits the crime of murder shall be punished by death."

LSA–R.S. 14:31: "Manslaughter is:

"(1) A homicide which would be murder under subdivision (1) of Article 30

"Manslaughter differs from murder in the element of provocation under the first definition of murder and manslaughter; and, under the second definition, the difference is in the nature of the several crimes being committed by the offender at the time a human being is killed."

Counsel for the defendant contended that requested Special Charge No. 14 was copied from the following statement made in the case of State v. Adams, 210 La. 782, 28 So.2d 269:

"The difference between murder and manslaughter is not in the existence or absence of an intent to kill, but in the existence or absence of malice aforethought."

Counsel contended that the trial judge's general charge, supra, gave the impression that the only difference in the two sections of LSA–R.S. 14:30 was in the nature of the several crimes being com-

mitted; they further contended that he disregarded the element of "intent."

While it is true that the foregoing statement was made in the case of State v. Adams, supra, it was not necessary to the decision of the case. In that matter, we held that a verdict of "guilty of attempted negligent homicide," was not responsive to a charge of attempting to commit murder. We also held that the verdict acquitted the defendant of the crime charged, attempted murder, and of the included crime, attempted manslaughter.

In his Per Curiam to Bills of Exceptions Nos. 14 and 15, the trial judge states that the matters complained of had been passed upon by the following statement from the case of State v. Sears, 220 La. 103, 55 So.2d 881:

"* * * The intent in manslaughter, like that in murder, is specific but the penalty for the crime is not as severe because of the mental and physi-

(murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or

"(2) A homicide committed, without any intent to cause death or great bodily harm.

"(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30, or of any intentional misdemeanor directly affecting the person; or

"(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under subdivision (1) of Article 30.

"Whoever commits manslaughter shall be imprisoned at hard labor for not more than twenty-one years."

cal excitement of the actor, produced by adequate cause.

"The contention of defense counsel that the absence of malice aforethought is the element distinguishing manslaughter from murder is based on common law conceptions. * * * But, since malice aforethought has been omitted as an element of murder under our statutory definition, it follows that its absence in manslaughter can no longer be regarded as the distinguishing feature of the crimes.

"The statements relied on by counsel, which are found in the cases of State v. Harper, 205 La. 228, 17 So.2d 260, and State v. Adams, 210 La. 782, 28 So.2d 269, are merely quotations of the common law distinction between murder and voluntary manslaughter and are not authority for the contention that malice is the essential difference between the crimes as defined by the Louisiana Criminal Code."

Counsel for the defendant contend that we have returned to the holding of State v. Adams, supra, and State v. Harper, supra, on which the defendant's requested Special Charge No. 14 was based, as inidicated by the following statement from State of Louisiana v. James, 241 La. 233, 128 So.2d 21:

"The answer to appellant's contention is that the definition of murder was not changed in essence when that crime was defined in Article 30 of our Criminal Code in 1942. Under the first subdivision of Article 30 the offender has the specific intent to kill, and malice in the old common-law definition of murder is nothing more than a specific intent to kill, and means the same thing. * * *"

We do not agree with counsel's contention; the statement in the James case, supra, does not make the requested charge correct.

The trial judge covered specific intent when he read to the jury the definition of murder as set forth in LSA–R.S. 14:30.

Bills of Exceptions Nos. 14 and 15 are without merit.

## BILL OF EXCEPTIONS NO. 16

Bill of Exceptions No. 16 was reserved to the trial judge's overruling the objection of defense counsel to the following portion of the written general charge to the jury:

"You are also the judges of the law, but in a different sense. You receive evidence from the witnesses; you receive the law from the Court, *and it is your duty to accept the law and to apply it as given you.*

"The Court will instruct you as to those principles of law applicable to the

theory of the case contended for by the prosecution, and also as to those principles applicable to that theory of the case contended for by the defense, and *you are to judge between those several principles of law which are applicable to the facts of the case.*" (Emphasis ours.)

In objecting to the above charge, counsel for the defendant stated:

"I want to add to that, Your Honor, that we are pleading, in this connection, the unconstitutionality of the statute upon which that charge is based, in violation of the principle enunciated in Special Instruction No. 1 which we asked: That it takes away from the jury the constitutional function and power and duty to be the sole judges of the law."

In brief filed in this Court, counsel for the defendant submit:

"It is respectfully submitted that the trial court, having correctly charged the jury, as requested in Instructions Nos. 1 through 4, inclusive, by defendant, committed prejudicial error when in charging the jury in its own words that they had the duty 'to accept' the law as given by the judge, without pointing out the distinction between 'moral' duty and 'legal' duty and further without making it clear the distinction between 'law' and 'The court's opinion of what the law is.'"

As we understand it, counsel's contention, in short, is that the jury should not accept the law as stated by the trial judge, but that the jury, itself, should judge the law.

In his Per Curiam to Bill of Exceptions No. 16, the trial judge remarks that the argument was being made that the definition of "insanity" was out of date, drawn before psychiatrists became known, and new conditions developed to determine sanity.

LSA–R.S. 15:385 provides:

"The judge shall charge the jury on the law applicable to the case and shall charge the jury that it is their duty to accept and to apply the law as laid down for them by the judge."

"* * * it is the duty of the judge to charge the jury on the law applicable to the case and it is the jury's duty to accept and apply the law as laid down by the judge. * * *" State v. Stewart, 238 La. 1036, 117 So.2d 583.

We find no merit in counsel's contentions; the trial judge followed the mandate of the law in instructing the jury as to the principles of law applicable to the theory of the case.

Bill of Exceptions No. 16 is without merit.

## BILL OF EXCEPTIONS NO. 17

 Bill of Exceptions No. 17 was reserved to the trial judge's overruling the objection of defense counsel to the following portion of the written general charge to the jury:

"If, after taking all the evidence into consideration, *you are in doubt as to whether the defendant was [in]sane [Footnote 7] at the time it is alleged by the State that he committed the crime* described in the indictment, that would indicate that the *evidence, as a whole, had not to your satisfaction overcome by its weight the presumption of law that the defendant was sane* at the time that the indictment alleges that he committed the crime therein described, and it would become your duty, under such a condition to hold that the defendant was sane at the time of the commission of the alleged crime." (Emphasis ours.)

In Bill of Exceptions No. 17, defense counsel averred:

"* * * immediately upon completion of charging the jury counsel for defendant objected and excepted to said paragraph in the written charge contained at the place above mentioned on the ground that the entire paragraph is

7. In brief, counsel contend, "Thus if we interpret the charge correctly and as the judge in his per curiam interpreted it,

misleading and confusing and put a greater burden on the defendant than is contemplated by the law on the question of preponderance of evidence as applied to the plea of insanity at the time of the commission of the offense all as shown by the note of evidence taken in connection with said objection and exception * * *"

The same contention was advanced in appellant's brief.

In his Per Curiam to Bill of Exceptions No. 17, the trial judge states:

"All persons are presumed to be sane. If a defendant pleads insanity at the time of the commission of the crime the burden is on him to prove that fact. If after hearing all of the evidence on the subject, *the jury has a doubt that the defendant was insane,* at the time of the commission of the crime, it follows that they must consider him sane.

"In other words, if the evidence does not convince the jury that the defendant was insane at the time of the commission of the crime, then they should not find that he was insane. There is no merit in this bill. See State v. Tapie, [173 La. 780] 138 So. 665." (Emphasis ours.)

it is an instruction to the jury that the accused had the burden of proving insanity beyond *doubt.*"

Just prior to giving the portion of the charge objected to by defense counsel, the trial judge stated in his written general charge:

"The accused in this case has filed a plea of not guilty by reason of INSANITY at the time of the commission of the offense for which he is charged. *This is a special plea which the defendant must prove by a preponderance of the testimony.*

"Article 14 of the Criminal Code reads as follows:

" 'If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility.'

"The test to be applied is the question whether the defendant was incapable of distinguishing between right and wrong. The Supreme Court in discussing this test, said:

" 'A person whose mind is so impaired or deranged, whether from nature or by accident or disease, as to render him incapable of reasoning, incapable of planning and acting, or of having knowledge of the nature and quality of the act he is doing, incapable of realizing his responsibility to society and to others, in sum, incapable of distin-

guishing between right and wrong, is insane, and therefore immune from criminal prosecution and punishment.' [State v. Tapie, 173 La. 780, 138 So. 665.]

"*All persons are presumed to be sane until the contrary has been proven by at least a preponderance of . competent, legal evidence.* As a result of this presumption, the burden of proof is upon the defendant in this case to overcome the presumption of law that he is sane *by at least a preponderance of the evidence heard during the trial of his plea* wherein he alleges his insanity.

"Let us not overlook the fact, gentlemen of the jury, that the burden of proof is not upon the State to show that the defendant is sane. He is presumed to be presently sane. He is also presumed to have been sane at the time of the commission of the crime. Consequently, *the burden is upon the defendant to show by a preponderance, or weight of the evidence, that he was insane at the time of the commission of the crime.*

"A person, in law, is said to be insane when, as a result of some disease of the mind, he is unable to contemplate, or foresee, the usual, probable, natural and reasonable consequences of his acts. In other words, a person is legally insane when he is unable to distinguish

between right and wrong. Personal peculiarities, eccentricities, fits of temper or rage, are not of themselves indicative of insanity. They may aid the jury in determining whether or not a defendant is sane or insane, but, of themselves, if the defendant is able to distinguish between right and wrong, would not be sufficient for the jury to base thereon a verdict of insanity." (Emphasis ours.)

We note that Special Instructions Nos. 8 and 9 requested by the defendant, and which were read to the jury, set forth what is meant by a preponderance of evidence.

We find that in the above portion of his charge immediately preceding the portion of his charge objected to by defense counsel, the trial judge correctly stated the law with respect to the burden placed upon a defendant who pleads insanity at the time of the commission of the offense. "Preponderance of the Evidence" is the rule (State v. Stewart, 238 La. 1036, 117 So.2d 583, and authorities cited and quoted therein; State v. Chinn, 229 La. 984, 87 So.2d 315), and this was repeatedly stated to the jury by the trial judge. Even in the portion of the charge objected to, the trial judge mentioned the weight of the evidence.

After considering the special instructions read to the jury and the general charge as a whole, we interpret the portion of the general charge objected to by defense counsel to mean that if the jury was undecided and doubted that the defendant was insane at the time of the commission of the offense charged, then the defendant had not proved by a preponderance of the evidence that he was insane at that time. There was nothing in the general charge to indicate to the jury that the defendant had to prove insanity at the time of the commission of the crime beyond a doubt or a reasonable doubt.

The written general charge was complete, lengthy, and detailed; it covered the facets of the law with respect to insanity. We conclude that the defendant was not prejudiced by the use of the word "doubt" and that its use did not constitute reversible error.

Bill of Exceptions No. 17 is without merit.

No bills of exceptions were reserved to the trial court's overruling a motion in arrest of judgment and a motion for a new trial filed by counsel for the defendant; they presented nothing new for the court's consideration.

For the reasons assigned, the conviction and sentence are affirmed.